SIDNEY R. HENDERSON AND PEGGY S. HENDERSON, HUSBAND AND WIFE, APPELLANTS, V. EDWARD P. FORMAN AND BARBARA J. FORMAN, HUSBAND AND WIFE, APPELLEES.

436 N.W.2d 526

Filed March 10, 1989.   No. 87-188.

Francis L. Winner, of Winner, Nichols, Douglas, Kelly and Arfmann, P.C., for appellants.

William P. Mueller and Rita C. Grimm, of McGinley, Lane, Mueller, O'Donnell & Williams, P.C., for appellees.

HASTINGS, C.J., GRANT, and FAHRNBRUCH, JJ., and HENDRIX and OLBERDING, D. JJ.

HASTINGS, C.J.

Plaintiffs, Sidney R. and Peggy S. Henderson, appeal from the judgment of the district court which directed a verdict against them at the close of all of the evidence in a case brought for damages alleging breach of warranty and misrepresentation. Although plaintiffs assign seven separate errors, including misapplication of the statute of frauds and misapplication of the law with respect to both misrepresentation and breach of warranty, the only viable claim is that the court erred in finding that the evidence was insufficient to support the pleaded theories of recovery.

The Candlelight Inn and Lounge, a motel in Scottsbluff, was purchased by the defendants, Edward P. and Barbara J. Forman, in 1974. They operated the motel until 1980, when they decided to sell it. The plaintiffs expressed an interest, and negotiations between the parties culminated in the sale of the property to the Hendersons on June 29, 1980.

Before buying the motel, Mr. Henderson visited the premises several times. On one occasion, Henderson and Mr. Forman went up on the roof for Henderson to see what shape the roof was in. Henderson testified that Forman told him the roof "was in good shape, there were no problems." During the

continuation of the recitation of the facts, because all of the negotiations and inspections were conducted by Mr. Henderson and Mr. Forman, we will refer to the parties either as Henderson or Forman.

Forman told Henderson that he had had some minor repairs made, and Henderson then called the roofer who had done the repairs to ask him his opinion about the roof. The roofer, Forrest Rose, told Henderson the roof needed "a lot of work." He also told Henderson the roof was old and probably needed to be replaced. When Henderson told Forman what Rose had said, Forman replied (according to Henderson) that the roof was in good shape and Rose was just looking for work.

Henderson then called another roofer, Charlie Schank, to inspect the roof. Schank told Henderson that the roof looked good. Henderson testified that he "had a lot of confidence" in what Schank and Forman had told him about the roof's condition. A friend of Forman's who "knew something about roofs" also looked the roof over and told Henderson "it looked okay." Forman's realtor told Henderson he assumed the roof was all right.

Henderson also inspected the interior of the building before he signed the contract. On the lower level of the motel, Henderson noticed that wallpaper was coming off and there was "moisture" or "wetness" on the wall. Forman told him that the wetness was caused by a leak from the ice machine and that the problem had been solved. Forman also told him that the wallpaper glue was probably inferior.

While further surveying the lower level, Henderson noticed that one of the sumps was full of water. Forman told him to be careful when he backflushed the swimming pool, but told him he should not have any problem. During further conversations about the basement, Forman assured Henderson that the drain around the outside of the building would keep any moisture out. Henderson, in testifying as to his conversation with Forman, said, "At that point he told me about the drain around the building to keep the basement dry. . . . He just said, 'You shouldn't have any moisture because that drain will keep the moisture out.' " Henderson testified that he believed Forman's statement that the drain would keep the basement dry.

Forman's testimony was that he had never had a water problem in the basement. He also said that he had told Henderson the roof was "marginal" and needed work. He stated that he also informed his realtor that the roof was marginal because he wanted to make sure that the Hendersons were aware of that.

The Hendersons signed the contract for the purchase of the motel in June 1980. The agreement contained the following language:

Seller hereby warrants that the property is and will be in operating condition on the date of possession; that the roof, heating, air conditioning, plumbing and swimming pool will be in operating condition on the date of possession; and that the items of personal property being sold hereunder will be in usable and workable condition on such date. . . .

. . . .

. . . All understandings and agreements heretofore had between the parties hereto are merged in this agreement which alone wholly and completely expresses the agreement of the parties, and this agreement is entered into after full investigation, neither party relying upon any statement or representation not embodied herein made by the other.

That year, the lounge in the lower level was flooded when the sump overflowed as Henderson backflushed the pool. The next year, Henderson put a new pump in the sump after he experienced water problems while draining the sink in the lounge.

In 1983, Henderson began experiencing severe water problems in the motel. In July, water began seeping into the lower-level lounge and soon was so bad that the lounge had to be closed. Because of that problem, the lounge was closed from July until the next January. Henderson had to have wells drilled to keep up with the problem. He also contacted several experts in an effort to solve the problem. In May 1984, the water reappeared. Henderson had a bentonite seal done in the basement, which was completed in November. However, in 1985, Henderson again found water, the basement had to be

resealed, and the pumps were again necessary. Water reappeared in 1986, and Henderson had to operate his pumps into 1987. The water seeping in through the floor caused much damage. The basement floor buckled when the basement was sealed, the carpet was ruined, Sheetrock on the walls had to be removed, and tile needed to be replaced.

Henderson also observed water coming into the building through the roof. There was leakage and discoloration on the ceilings in the upper level of the motel.

Experts testified at the trial as to the cause of the leaks. Meredith Schaff, a civil engineer, described the drain that was installed around the periphery of the building when it was built in 1967. The pipes that were installed around the outer wall of the motel at that time, had they been properly placed, would have been at a level below the floor and below the footings of the motel. In that way, gravity would pull ground water into the pipes and away from the motel's foundation. The pipes, according to Schaff, should have sloped so that water in them would run to a drain, where it could be disposed of by a sump pump. However, the pipes were improperly placed. They had been installed at a level below the floor, but above the footings. The pipes were placed only 1 foot lower than the floor level, and they should have been placed 3 feet below the floor level. The engineer further testified that if the pipes had been placed even 1 foot below the exterior wall, there would not have been the water problem that existed. He also testified that it would not be economically feasible or practical to correct the problem.

Henderson testified that he first learned of the design defect in the drain system in December 1985 or January 1986 and that if he had known about it, he would not have bought the motel at the price he paid for it, or maybe not at all.

The evidence regarding the roof came from a structural engineer. In short, the roof was not designed to withstand the weight it is required to support. The joists should have been larger or placed closer together in order to support the roof properly, and the beams supporting the joists are undersized. Additionally, a design feature of the roof as installed allowed snow to drift on the roof, which added to the weight problem. Also, the scuppers (openings) through which water was

supposed to drain off the roof were actually built up higher than the roof, so that water has to rise to a certain level before it will spill into the roof's drain system. The structure of the roof also does not allow for any ventilation, according to the witness, so that eventually moisture will cause the joists and sheathing to rot.

According to the trial testimony, the roof has always had problems with water "ponding" on it. In 1979, Rose (the roofer) recommended to Forman that he replace the roof. He gave Forman an estimate based on replacing the roofing surface, but not the underlying structure. This was because there was no way of knowing if there was damage to the joists and beams unless the surface was removed. Forman decided to "nurse it along."

Forman later testified that he had no knowledge of structural defects in the roof until the lawsuit was filed, although he admitted that he thought there were problems with the roofing surface. Henderson first learned of the design defect in the roof in April 1984, when his insurance company denied coverage because the roof was defectively designed. He stated that he would not have bought the motel, at least not at the price he had paid, had he known of the design defect.

The petition filed in this case on April 3, 1986, alleged that Forman breached express and implied warranties, failed to disclose known defects, and made fraudulent misrepresentations, thereby causing the resulting damages.

As previously stated, at the close of the plaintiffs' evidence, the trial court sustained the defendants' motion for a directed verdict and dismissed the case. The court first stated that it was the court's job to construe the meaning of the contract. The court then cited the contractual provisions, noting that nowhere was there an express warranty that the building was free from design defects and that there was only a clause providing that the building was in operating condition on the *date of possession*. The court also found that implied warranty requirements are only applicable to original builders, not second sellers, as Forman was. Lastly, according to the court, since Forman did not know about the design defects, and since he did truthfully tell Henderson the roof *surface* needed work

and that he had had no water problems in the basement, the court found that the misrepresentation claim was also baseless. Although the trial judge commented in court on the statute of limitations, his order only specified that the claims were dismissed because of "insufficiency of the evidence to support the pleaded theories of recovery . . . ."

Although Hendersons alleged breach of both express and implied warranty in the petition, on appeal it is argued only that the court erred in finding no breach of express warranty. In any event, the doctrine of implied warranty is inapplicable here. In *Henggeler v. Jindra*, 191 Neb. 317, 318-19, 214 N.W.2d 925, 926 (1974), we said, "[A] contractor constructing a building impliedly warrants that the building will be erected in a workmanlike manner and in accordance with good usage and accepted practices in the community in which the work is done." The court in *Bernstein v. Ainsworth*, 220 Neb. 670, 371 N.W.2d 682 (1985), declined to apply the general rule in every factual situation, stating, "The implied warranty in connection with the construction of a building, as discussed in *Henggeler v. Jindra, supra*, is not applicable to the sale of the building by the owner who is not the builder." *Bernstein, supra* at 677, 371 N.W.2d at 688.

As to the claim regarding an express warranty, Hendersons argue that the language of the contract that "[s]eller hereby warrants that the . . . roof [and] plumbing . . . will be in operating condition on the date of possession" was breached.

On the other hand, Formans contend that both the roof and the drain were fulfilling their intended purposes on the date that Hendersons took possession. The roof, on the date of possession, was protecting the occupants from the elements, and the drain, on the date of possession, was adequately carrying water away. Formans urge the court to follow the contract's plain language and to *not* construe the contract as guaranteeing that the roof and drain would be in operating condition for any amount of time *after* the purchase.

The issue is controlled by this court's holdings in *Gunset v. Mossman*, 196 Neb. 529, 243 N.W.2d 783 (1976), and *Rosenberry v. Beck*, 205 Neb. 664, 289 N.W.2d 523 (1980).

In *Gunset*, the plaintiffs purchased a home from the

defendant. The purchase agreement contained a provision stating, " 'Seller agrees to maintain, until delivery of possession, the heating, air conditioning, water heater, sewer, plumbing and electrical systems and any built-in appliances in working condition.' " (Emphasis omitted.) *Gunset, supra* at 530, 243 N.W.2d at 784. Shortly after taking possession, plaintiffs had the furnace boiler inspected, whereupon it was discovered that the boiler had a leak. Plaintiffs filed suit, claiming that defendant had breached the above provision in the contract.

The court ignored the expert testimony to the effect that the boiler was not in working condition on the date of possession, and held that the parties' understanding of the term "working condition" was more important than the expert's opinions.

> The only reasonable interpretation of the words "working condition" under the facts of this case is that the defendant agreed to deliver possession of the furnace in the same operating condition existing at the time the agreement was signed. The clause in dispute was not a warranty. Since no allegation is made that the boiler's condition worsened from the date the agreement was signed to the date the plaintiffs obtained possession, the plaintiffs received all they bargained for.

*Id.* at 532, 243 N.W.2d at 785.

In *Rosenberry v. Beck, supra*, the court reaffirmed its holding in *Gunset*. The purchase agreement in *Rosenberry* also contained the clause providing that the heating system would be maintained in working condition until delivery of possession. Three months after plaintiffs took possession, an employee of the gas company informed them the furnace had a crack, making it unsafe for operation. The evidence indicated that the furnace had worked adequately while the seller lived in the house and that the seller had no knowledge of the crack.

The court relied on *Gunset* in determining that the plaintiffs had failed to show breach of contract. The court once again placed no importance on the expert's testimony that the defect most likely existed at the time the purchase agreement was executed. The court quoted from *Gunset* in concluding that the plaintiffs had received all that they had bargained for.

Thus, according to relevant pronouncements by this court, the provision in Hendersons' contract that the roof and plumbing would be in operating condition on the date of possession only provided Hendersons with a promise that the roof and drain would be in the same condition on the date of possession as they were on the date of purchase. There was no express warranty that the roof and drain would continue to work to Hendersons' expectations after delivery was accomplished. The trial court's finding that this provision was not breached was correct.

Plaintiffs contend that Forman fraudulently misrepresented to Henderson that both the roof and the drain system were good. On appeal from an order of a trial court dismissing an action at the close of the plaintiff's evidence, this court must accept plaintiff's evidence as true, together with reasonable conclusions deducible from that evidence. *Russell v. Norton*, 229 Neb. 379, 427 N.W.2d 762 (1988).

In accordance with that rule, we must find that Forman represented to Henderson that the roof "was in good shape, there were no problems"; that minor repairs had been made to the roof; and that the roofer said the roof needed replacing merely to create work for himself.

It is true that to constitute a false representation, a statement must be made as a statement of fact, not merely the expression of an opinion. *Kliewer v. Wall Constr. Co.*, 229 Neb. 867, 429 N.W.2d 373 (1988). In *Kliewer*, the defendant's statement, " 'Well, we've been up that ladder before and a lot of other people have been up and down that ladder, so I guess it's safe,' " was found by this court to be "nothing more than his opinion that it was safe to climb the ladder." *Id.* at 876-77, 429 N.W.2d at 379-80. However, in this case the statement was more than a guess. Forman said the roof *"was in good shape* [and] *there were no problems,"* and this in the face of his knowledge that one of the roofing experts had said that the roof needed replacing. (Emphasis supplied.)

To recover for fraud based upon misrepresentation, Hendersons had the burden of proving that (1) Forman made a representation of material fact; (2) the representation was false; (3) the representation, when made, was known to be false or

was made recklessly as a positive assertion without knowledge concerning the truth of the representation; (4) the representation was made with the intention that Hendersons would rely on it; (5) Hendersons reasonably relied on the representation; and (6) as the result of such reliance, Hendersons suffered damage. See *Edwin Bender & Sons v. Ericson Livestock Comm. Co.*, 228 Neb. 157, 421 N.W.2d 766 (1988).

The representations as to the water problem in the basement fall into a similar category. The crucial representations made by Forman were that the moisture on the wall was from an ice machine, that Henderson must be careful in backflushing the swimming pool, and that "[y]ou shouldn't have any moisture because that drain *will keep the moisture out.*" (Emphasis supplied.)

The evidence indicated that the sole cause of the water problem in the basement was the misdesign and inadequacy of the drain system. As in the case of the roof, where Forman stated that it was in good shape and there were no problems, the statement that the drain would keep the moisture out was false.

Even assuming that Forman did not know that his statements were false, having said that the roof was in good shape and there were no problems and that the drain would keep the moisture out, a question of fact was presented as to whether such statements were made "recklessly as a positive assertion without knowledge concerning the truth of the representation." As this court said in *Edwin Bender & Sons v. Ericson Livestock Comm. Co., supra* at 166-67, 421 N.W.2d at 772: " 'And if a party, without knowing whether his statements are true or not, makes an assertion as to any particular matter upon which the other party has relied, the party defrauded in a proper case will be entitled to relief.'. . ." "On the record presented, Bender was entitled to have the questions about Ericson's warranty and misrepresentation of a material fact submitted to the jury." *Id.* at 167, 421 N.W.2d at 772. Such is the case here.

Also of importance is the question of whether Henderson reasonably relied on the representations allegedly made by Forman. Henderson testified that he did. It may be argued that

as to the roof, he did not so rely because he sought expert advice. The fact that a plaintiff made inquiries elsewhere which did not disclose the falsity of the representations is not, as a matter of law, a defense to a fraud action. Assuming all other ingredients of liability are present, a plaintiff is entitled to relief if the representations were a material inducement to the contract, although the plaintiff may have made efforts to discover the truth thereof and did not rely wholly upon the veracity of the defendant. *Foley v. Holtry*, 43 Neb. 133, 61 N.W. 120 (1894). See, also, *Russo v. Williams*, 160 Neb. 564, 71 N.W.2d 131 (1955).

The questions as to whether the statements were representations as to fact or merely opinion, and whether Henderson did rely on them, were properly questions for the jury to decide.

The parties argue the question of the statute of limitations. However, no finding in this regard was included in the court's order of dismissal. As a general rule, this court will dispose of cases on appeal on the theory on which they were presented to and disposed of by the trial court. *Obermeier v. Bennett*, 230 Neb. 184, 430 N.W.2d 524 (1988).

The judgment of the district court is reversed and the cause remanded for further proceedings consistent with this opinion.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.