# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-1951

_____

Dave Dahlgren, et al.,           *

                                        *

       Plaintiffs - Appellees,     *

                                        *    Appeal from the United States

   v.                               *    District Court for the

                                        *    District of Nebraska.

First National Bank of Holdrege,    *

                                        *

       Defendant - Appellant.     *

_____

Submitted: December 12, 2007
Filed: July 11, 2008

_____

Before LOKEN, Chief Judge, WOLLMAN and SHEPHERD, Circuit Judges.

_____

LOKEN, Chief Judge.

When Damrow Cattle Company ("DCC") was placed in involuntary receivership and a Chapter 7 bankruptcy proceeding, fourteen cattle investors and corn producers[1] who were fattening cattle and storing grain at the DCC feedlot lost over $1.7 million plus nearly $200,000 in bankruptcy litigation expenses. They sued the First National Bank of Holdrege ("the Bank"), DCC's primary lender from 1983 until

_____

[1] Dave Dahlgren, Dahlgren's Inc., Theodore Collin, Lloyd Erickson, Erickson Land and Cattle, Dixon Granstra d/b/a Granstra Cattle, DG Farms, Inc., Skane, Inc., Clark Nelson, Wells AG Enterprises, Inc., Don Sjogren, BJW Farms, Inc., EWW Farms, Inc., and Dwayne Kudlacek.

2000, for treble damages and attorneys' fees under the Racketeering Influenced and Corrupt Organizations Act ("RICO") and for fraud and negligent misrepresentation under state law, claiming that the Bank misled them into continuing to do business with DCC by concealing its increasing financial weakness to protect the Bank's substantial interest as DCC's creditor. A jury found the Bank liable on all claims, and the district court denied without opinion the Bank's post-verdict motion for judgment as a matter of law. The Bank appeals. We reverse the denial of judgment as a matter of law on the RICO claims. Reviewing the facts in the light most favorable to the jury's verdict, we affirm in part and reverse in part the jury verdict on the various fraud claims. See Fowler v. Smithkline Beecham Clinical Labs., Inc., 225 F.3d 1013, 1014 (8th Cir. 2000) (standard of review).

## I. Factual Background

Dennis Damrow ("Damrow") and his brother and father began operating DCC as a commercial feedlot near Holdrege, Nebraska, in 1983. The Damrows formed a financing company, DFF, Inc., that offered investors the option of borrowing the cost of purchasing and feeding cattle at DCC. Damrow was the general manager of DCC and managed the day-to-day operations of DFF. The Bank provided loans and banking services to both companies. In 1990, Damrow invested in and began managing a second feedlot, Carter Feeders, near Orleans, Nebraska. The Bank provided banking services for Carter Feeders and its financing entity, CFF, Inc.

Investors placed feeder cattle at the feedlot, where DCC fattened the cattle before selling them to meat packers. DCC billed investors monthly for feed and other costs. Investors who farmed in the area also stored grain at the feedlot, either to feed their own cattle or to sell to DCC. An investor financing the purchase and fattening of cattle through DFF signed a promissory note to DFF. DFF signed a promissory note and assigned the investor's note to the Bank in exchange for a loan to purchase the cattle. When DCC sold cattle to a meat packer, the packer sent the purchase price

to the Bank, which deposited the funds into DCC's account. DCC recovered its feedlot expenses, reimbursed DFF for its advances, and paid the investor his down-payment and any profit from the sale. DFF repaid the Bank's loan. Investors commonly used their share of the sale proceeds to finance a new lot of cattle at DCC.

DCC experienced steady growth, expanding its operating capacity from 1,200 cattle in 1983 to 17,500 cattle when it was placed in receivership in 2001. Damrow testified that after 1996, DCC owned thirty to fifty percent of the cattle being fed at any given time. Dr. Rodney Jones, an agricultural economics professor, testified as plaintiffs' expert that the owner of cattle incurs greater risk in cattle feeding than the feedlot operator, so the percentage of cattle owned by the feedlot significantly affects its risk of loss.

From 1994 through 1998, Dr. Jones and others testified that the Bank repeatedly honored checks when the DCC and DFF accounts were substantially overdrawn, sometimes in excess of $1 million, and DCC had no unborrowed amount on its working capital line of credit. DCC often waited months after selling a lot of cattle before using the proceeds to pay the corresponding DFF note, thereby using money borrowed by DFF to effectively increase DCC's borrowings. The Bank contributed to this credit-shifting process by refusing on multiple occasions to process DCC checks to pay off DFF notes when DCC's account was overdrawn. Dr. Jones testified that these large overdrafts suggested a borrower with cash flow problems that could lead to business failure. However, substantial overdrafts ceased after the DCC and DFF lines of credit were increased in mid-to-late 1997 when the Bank's correspondent regional bank, First National Bank of Omaha ("FNBO"), investigated Damrow and agreed to participate in these lines of credit. By May 1999, FNBO's participation in the DCC operating line of credit and the DFF investor line of credit had increased to a total of $7 million.

In 1996 and 1997, two junior officers at the Bank warned senior management of irregularities in the financing of DFF -- large initial advances in round figures to

purchase cattle and feed, some totaling more than the cattle would bring when sold; note maturities longer than the four-to-five months needed to fatten cattle; and DFF notes remaining unpaid for months after the cattle were sold. After receiving the second officer's critical memorandum, DCC loan officer Ron Sterr wrote a letter asking Damrow to address the problem of DFF overdrafts and overdue notes. However, Sterr and Bank president Kenneth Slominski excused the failure to pay DFF notes when cattle were sold by suggesting that Damrow was just replacing the sold cattle with new feeder cattle for the same investors.[2]

In September 1997, the Bank entered into an agreement with the Office of the Comptroller of the Currency to address the Bank's deteriorating condition. The agreement required the Bank to make management changes, appoint an oversight committee, abide by new lending limits and procedures, and reduce classified and non-performing assets. A new president was hired in late 1998, charged with the task of eliminating classified and non-performing assets so that the Bank could achieve compliance with the regulatory agreement. Cattle losses in 1997 and 1998 caused DCC's loan rating at the Bank to decline from a "1" in 1997, to a "4" in mid-1999, which placed its line-of-credit loan on the Bank's "watch" list.

In September 1999, after years of losses and increasing liabilities, the non-Damrow shareholders at Carter Feeders told the Bank they suspected Damrow of falsifying financial statements by overstating the cattle owned by Carter Feeders by over $1 million. Damrow ceased managing Carter Feeders in November 12, and Carter Feeders declared bankruptcy in December 1999. Upset with the Bank's handling of the Carter Feeders problem, Damrow asked FNBO if it would take over all of the various Damrow credits in December 1999.

---

[2]Even if accurate, this rationale did not excuse the failure to use sale proceeds to pay off the *investors'* notes to DFF for the initial purchase of the sold cattle, notes held by the Bank as DFF's assignee. However, this lawsuit is not about that risk to the plaintiff investors, as all DFF notes were eventually paid.

In January 2000, Damrow admitted to the Bank that he had filed false financial statements for Carter Feeders, blaming the other Carter Feeders shareholders. The Bank's board of directors decided to end its banking relationship with Damrow on January 9, 2000. After persuading Damrow to sign a new deed of trust on the DCC feedlot, which was owned by Damrow or his personal farming entity, the Bank told Damrow to find a new lender. Damrow continued discussions with FNBO, which took over the DCC and DFF credits on April 14 after conducting its own due diligence investigation. Participating with FNBO was Adams Bank & Trust, where loan officer Sterr began working after leaving the Bank in late 1999. The Bank severed its last tie with the Damrow credits on July 18, 2000, when a final term note was paid from proceeds of Damrow's sale of the feedlot property, consistent with his refinancing agreement with FNBO.

In January 2001, FNBO heard that double counting of cattle was occurring at the DCC feedlot. FNBO investigated and quickly placed DCC into receivership, liquidating its cattle inventory. An involuntary Chapter 7 bankruptcy followed. FNBO and Adams Bank & Trust sued the Bank for failing to disclose financial information about the Damrow operations; both cases settled. After litigating with FNBO and the DCC trustee over ownership of corn and cattle at the feedlot when the receivership began, plaintiffs commenced this action to recover from the Bank their losses and litigation expenses in the DCC bankruptcy. Damrow pleaded guilty to felony charges that, between December 1993 and January 2001, he schemed to defraud the Bank, FNBO, and Adams Bank & Trust by materially misrepresenting the ownership of cattle on borrowing reports to the banks, by falsifying documents to deceive inspectors and bank representatives regarding the ownership of cattle at the DCC and Carter Feeders feedlots, and by pledging to the banks cattle that were owned by others. Sentenced to forty months in prison, Damrow was incarcerated at the time of trial and testified for the plaintiffs by deposition.

## II. The RICO Claims

Enacted to strengthen criminal and civil remedies against organized crime, RICO provides a private right of action for any person "injured in his business or property by reason of a violation of" its substantive prohibitions. 18 U.S.C. § 1964(c). The prohibition at issue here is 18 U.S.C. § 1962(c), which provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

To prevail on their RICO claims, plaintiffs must prove that the Bank engaged in the conduct of an enterprise through a pattern of racketeering activity. The enterprise in question was DCC. The Bank's alleged predicate acts of racketeering were multiple instances of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343, offenses that are included in the definition of "racketeering activity" in 18 U.S.C. § 1961(1)(B). To constitute racketeering activity under RICO, the predicate acts must be related and must "amount to or pose a threat of continued criminal activity." H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239 (1989). "Any recoverable damages occurring by reason of a violation of § 1962(c) will flow from the commission of the predicate acts." Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985). "Though mail fraud can be a predicate act, mailings are insufficient to establish the continuity factor unless they contain misrepresentations themselves." Wisdom v. First Midwest Bank of Poplar Bluff, 167 F.3d 402, 407 (8th Cir. 1999).

The Bank argues that plaintiffs introduced insufficient evidence that the Bank "conduct[ed] or participate[d], directly or indirectly, in the conduct of [DCC's] affairs through a pattern of racketeering activity" within the meaning of § 1962(c). We agree. "In order to participate, directly or indirectly, in the conduct of [an] enterprise's affairs, one must have some part in directing those affairs." Reves v.

Ernst & Young, 507 U.S. 170, 179 (1993) (quotations omitted). Although § 1962(c) liability is not limited to those with a formal position within the enterprise:

> § 1962(c) cannot be interpreted to reach complete "outsiders" because liability depends on showing that the defendants conducted or participated in the conduct of the "*enterprise's* affairs," not just their *own* affairs. Of course, "outsiders" may be liable under § 1962(c) if they are "associated with" an enterprise and participate in the conduct of *its* affairs -- that is, participate in the operation or management of the enterprise itself . . . .

Id. at 185 (emphasis in original). Thus, the word "conduct" means the Bank exercised some degree of control over the operation or management of DCC's affairs.

When the RICO defendant was the alleged enterprise's principal lender, a court considering a motion for summary judgment or for judgment as a matter of law must carefully distinguish between the bank conducting its own affairs as creditor, and the bank taking additional steps as an outsider to direct the operation or management of its customer, the RICO enterprise. As the Third Circuit stated in a similar case, "While it is certainly true that a major creditor of a corporation can have substantial persuasive power and some legal authority over [a borrowing customer's] management, alone, such power is not equivalent to having the power to conduct or participate directly or indirectly in the conduct in the affairs of those corporations." Dongelewicz v. PNC Bank Nat'l Ass'n, 104 Fed. App'x 811, 817-18 (3d Cir. 2004) (unpublished) (quotations omitted), cert. denied, 543 U.S. 1096 (2005). A bank's financial assistance and professional services may assist a customer engaging in racketeering activities, but that alone does not satisfy the stringent "operation and management" test of Reves. See Schmidt v. Fleet Bank, 16 F. Supp. 2d 340, 346-48 (S.D.N.Y. 1998), and cases cited.[3] In Schmidt, allegations that the bank approved

---

[3]Abrogated on other grounds by Pavlov v. Bank of New York Co., 25 Fed. App'x 70 (2d Cir. 2002) (unpublished).

overdrafts on 500 occasions, misrepresented the status of accounts to investors, and helped its customer conceal his fraudulent scheme were held to be insufficient to satisfy this test. Plaintiffs have not cited and we have not found any post-Reves case in which a bank or financial services company was held to have conducted the affairs of a RICO enterprise that was an unrelated customer of the bank.[4]

With one possible exception, all of the Bank's actions that plaintiffs cite as evidence of the Bank's control of DCC fall into the category of a creditor conducting its own affairs. The Bank allowed the commingling of Damrow entity funds, honored substantial overdrafts (in effect, informally increasing the borrower's line of credit, for a one-time fee), allowed DFF notes to the Bank to remain past due (again, thereby increasing DCC's line of credit), honored DCC n.s.f. checks to investors, recommended its customer DCC to other Bank customers, encouraged its correspondent regional bank to participate in the lines of credit, told Damrow he must increase equity investment and eliminate intra-enterprise liabilities on DCC's financial statement to get a loan approved, transferred funds between Damrow entity accounts pursuant to loan agreement cross-guarantees without Damrow's permission, and required Damrow to sign a new deed of trust on the feedlot. As the court held in Schmidt, simply because a bank *allows* a heavily indebted customer to take actions such as overdrafts and late note payments that the bank might prevent by exercising its formidable rights as creditor is not evidence that the bank controlled the customer's operations and management. 16 F. Supp. 2d at 346-48. "Bankers do not become racketeers by acting like bankers." Terry A. Lambert Plumbing, Inc. v. Western Sec. Bank, 934 F.2d 976, 981 (8th Cir. 1991).

The possible exception, which plaintiffs greatly emphasized at trial and on appeal, involved the Bank's actions when a substantial Damrow customer, John Morken, became insolvent in 1994. In June 1994, Damrow learned that Morken was

---

[4]In Brown v. LaSalle Northwest Nat'l Bank, 820 F. Supp. 1078, 1082 (N.D. Ill. 1993), affiliates of the bank were the RICO enterprise.

facing bankruptcy. The Bank had advanced some $5 million on DFF and CFF notes secured by cattle that Morken was then feeding at the DCC and Carter Feeders feedlots. DCC was also an unsecured creditor for grain fed to those cattle, and Damrow testified he had received payments from Morken that might be voidable preferences in a Morken bankruptcy. Damrow immediately contacted Slominski at the Bank. Slominski and the Bank's attorney decided that the Bank would foreclose on the cattle and that DCC and Carter Feeders would buy the foreclosed cattle for the amount of the DFF and CFF notes, using funds borrowed from the Bank. Damrow testified that he was hesitant to purchase the Morken cattle but did so because of his twenty-year relationship with the Bank, because Slominski promised him that DCC would not suffer financially, and because it was the only way he could recover DCC's substantial claim for feed "owed off the John Morken cattle."

Following the foreclosures, the Bank discovered that some of the foreclosed notes were signed by Morken personally, rather than as an officer of his company, Spring Grove Livestock. The Bank did not have perfected security interests in cattle owned by Morken personally. Damrow testified that Slominski and the Bank's attorney drove to the DCC feedlot and had the Morken notes altered, using the typewriter Damrow used to create the notes to add "Spring Grove Livestock" on the top of each note and "authorized agent" above Morken's signature. The Morken and Spring Grove bankruptcy trustees discovered the alterations and sued the Bank, DCC, Carter Feeders, DFF and CFF to set aside the foreclosures and to recover the entire value of the DFF and CFF notes. The parties negotiated, and Slominski told Damrow the Bank wanted to settle the dispute with the trustees for $2.6 million, with the Bank paying half and DCC and Carter Feeders paying the other half, using funds borrowed from the Bank. Damrow testified that, after Slominski threatened not to renew the DCC and Carter Feeders lines of credit, Damrow met with their other shareholders, who unanimously agreed to settle.

Plaintiffs argue that the Bank controlled DCC's actions in purchasing the Morken cattle at an inflated foreclosure price, illegally altering the Morken notes, and

agreeing to a costly settlement with the trustees, leaving DCC with a debt burden that ultimately led to its receivership some six years later. Plaintiffs note that DCC had only a small stake in the Morken bankruptcy -- its unpaid feed -- because DCC had not guaranteed the DFF and CFF notes to the Bank. Therefore, the Bank, not Damrow, must have controlled DCC's irrational decision to help fund the settlement. We certainly agree that the Bank's action in altering the Morken notes was shameful. But it was Damrow who made the decisions that DCC would help purchase the cattle in foreclosure and contribute to the settlement of claims by the Morken and Spring Grove trustees. Urging Damrow to take those actions was consistent with the Bank's control of its own affairs as creditor. And those decisions were not so irrational, from Damrow's and DCC's perspective, as to demonstrate that the Bank was controlling DCC.[5] More importantly, this was an isolated incident that occurred long before the Bank's alleged predicate acts with the plaintiffs. Therefore, even assuming that a rational jury could believe the testimony of Damrow -- who was convicted of defrauding the Bank and other DCC lenders -- that the Bank controlled DCC's actions in these unfortunate transactions, that is not sufficient evidence that the Bank "engaged . . . in the conduct of [DCC's] affairs through a pattern of racketeering activity" that injured the plaintiffs years later.[6]

Because plaintiffs failed to establish that the Bank directed the operations or management of DCC during the time they were allegedly injured by the Bank's pattern of racketeering activity, the district court erred in denying the Bank's motion for judgment as a matter of law dismissing their RICO claims. Therefore, we need not

---

[5]Damrow testified that the settlement permitted the Damrow and Carter Feeders entities to avoid possible preference claims relating to the $8-9 million of feedlot business in the 90 days before the Morken and Spring Grove bankruptcies. More significantly, every DCC and Carter Feeders shareholder met personally with the Bank and agreed to those companies participating in the settlement.

[6]Our decision in Handeen v. Lemaire, 112 F.3d 1339 (8th Cir. 1997), on which plaintiffs heavily rely, is clearly distinguishable for this reason, and others.

-10-

consider the Bank's arguments that plaintiffs failed to prove other elements of these claims.

## II. State Law Tort Claims

Plaintiffs asserted tort claims against the Bank for fraudulent misrepresentation, fraudulent concealment, and negligent misrepresentation under Nebraska law. The jury returned verdicts in favor of each plaintiff on all three claims. The Bank appeals the district court's denial of its motion for judgment as a matter of law on these distinct but related claims. As the district court submitted a single damage question for the multiple claims, we must affirm the jury's award to a plaintiff if the evidence supports the award on any one of the claims. See Conseco Fin. Serv. Corp. v. N. Am. Mortgage Co., 381 F.3d 811, 823 (8th Cir. 2004).

## A. The Elements of Each Tort

**1. Fraudulent Misrepresentation.** Plaintiffs' fraudulent misrepresentation claims required proof that an agent of the Bank knowingly or recklessly made a false representation of material fact with the intent that plaintiff rely on it, and that plaintiff did reasonably rely resulting in damage. See Four R Cattle Co. v. Mullins, 570 N.W.2d 813, 816 (Neb. 1997); Henderson v. Forman, 436 N.W.2d 526, 532 (Neb. 1989). The Supreme Court of Nebraska looks to § 531 of the Restatement (Second) of Torts (1977) in analyzing fraudulent misrepresentation claims. Bank of Valley v. Mattson, 339 N.W.2d 923, 927 (Neb. 1983). Section 531 provides that liability is limited to a plaintiff's "pecuniary loss suffered . . . through . . . justifiable reliance in the type of transaction in which [defendant] intends or has reason to expect [plaintiff's] conduct to be influenced." Comment *g* explains that the reference to the *type* of transaction expected means that the transaction that in fact causes pecuniary loss "may differ in matters of detail or in extent, unless these differences are so great as to amount to a change in the essential character of the transaction."

-11-

**2. Fraudulent Concealment.** Under Nebraska law, the Bank is liable for fraudulent concealment if it had a duty to disclose a known material fact, concealed that fact with the intent that plaintiff act in response to the concealment, and plaintiff reasonably relied and was injured by the concealment. See Streeks, Inc. v. Diamond Hill Farms, Inc., 605 N.W.2d 110, 118 (Neb. 2000). The Court in Streeks held that "whether a legal duty exists is a question of law" and that § 551 of the Restatement (Second) of Torts "properly sets out when a duty to disclose may arise." Id. at 119, 121.[7] Section 551(2) provides in relevant part:

> (2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated . . . (b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and (c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and . . . (e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade, or other objective circumstances, would reasonably expect a disclosure of those facts.

**3. Negligent Misrepresentation.** The Supreme Court of Nebraska has adopted "the definition of the negligent misrepresentation cause of action found in § 552" of the Restatement (Second) of Torts. Gibb v. Citicorp Mortgage, Inc., 518 N.W.2d 910, 922 (Neb. 1994). Section 552 provides in relevant part:

---

[7]The Bank argues that the district court erred in not submitting the factual aspects of this issue to the jury. This contention was waived when counsel for the bank, having initially raised the issue, conceded during a mid-trial discussion with the district court and again during the jury instructions conference that the court's fraudulent concealment instruction properly treated the issue of duty as one of law for the court. See generally United States v. Olano, 507 U.S. 725, 733 (1993).

-12-

(1) One who, in the course of his business . . . or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) . . . the liability stated in Subsection (1) is limited to loss suffered

(a) by the person . . . for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

Liability for negligent misrepresentation "is more restricted than for fraudulent misrepresentation" because of "the difference between the obligations of honesty and of care." Gibb, 518 N.W.2d at 921.

## B. Discussion

When a third party asks a bank about its customer's financial affairs or condition, the bank's general duty of confidentiality to its customers is at issue.[8] Nonetheless, though the issue has not been squarely addressed, we agree with the district court that the Supreme Court of Nebraska would apply the above-summarized tort principles to claims that a bank deceived or misled the third party in responding to the inquiry. See R.A. Peck, Inc. v. Liberty Federal Sav. Bank, 766 P.2d 928, 932-37 (N.M. App. 1988), discussed favorably in Streeks, 605 N.W.2d at 120.

_____

[8]See Kesselman v. Nat'l Bank of Ariz., 937 P.2d 341, 343-46 (Ariz. App. 1996) (analyzing the confidentiality issue and collecting cases).

-13-

Our research suggests that, in every case where banks were held liable for misrepresentations or non-disclosures about their customers' affairs, "the banks were directly involved with the third parties in the transactions that were the subject of litigation." Kesselman, 937 P.2d at 345. Here, on the other hand, every transaction plaintiffs entered into with DCC that gave rise to their damage claims in this lawsuit occurred *after* the Bank ended its customer and lending relationships with DCC and Dennis Damrow. Moreover, most plaintiffs were aware that FNBO had replaced the Bank as Damrow's lender before their loss-causing cattle and corn transactions. Plaintiffs' theory was that the Bank's false representations and non-disclosures about DCC's financial condition and the status of its borrowings with the Bank lulled plaintiffs into continuing to do business with DCC, resulting in their losses. Yet prior to entering into the loss-causing transactions in 2000, no plaintiff asked an FNBO loan officer (or Sterr, who was now the loan officer for DCC at Adams Bank, the bank participating with FNBO on the Damrow credits) for information about DCC's current financial condition or the status of its borrowings. These facts require us to focus more closely on the specific misrepresentations and non-disclosures alleged by each plaintiff. We begin with those who discussed DCC with Bank officers after FNBO replaced the Bank.

**Lloyd Erickson and Erickson Land and Cattle.** Lloyd Erickson and the corporation he owned with his son began feeding cattle and delivering corn to DCC in the late 1980s. Both were also long-standing customers of the Bank. In early 2000, the Ericksons heard negative rumors about Damrow from the Carter Feeders shareholders. Erickson testified that, at a meeting in May, his father asked Bank president Riley and former DCC loan officer Eric Titus whether DCC is "an okay place to [be] feeding?" Titus responded, "as far as we know, everything is fine." Based on that assurance, the Ericksons continued to do business with DCC, delivering corn to DCC in September and purchasing two lots of cattle. Erickson and Erickson Land and Cattle lost $66,393.58 in cattle, $69,743.66 in corn and incurred $26,476.62 in attorneys' fees after DCC was placed in receivership.

-14-

There is ample evidence in the record that Titus was aware of significant financial problems with DCC when he made this affirmative misrepresentation. Titus had tracked past due DCC notes and overdrafts for years, reported to the Bank's board of directors about the deteriorating Carter Feeders situation on January 3, 2000, and was present for the discussion of the Damrow lines of credit at that meeting, which led to the board's decision to end its relationship with Damrow and DCC. Titus repeatedly stated, "I do not recall," when asked about his knowledge of the financial condition of DCC, testimony the jury likely considered evasive. At a minimum, Titus was negligent in telling Bank customer Erickson that "everything is fine" at DCC without disclosing that the Bank had ended its relationships with Damrow. In these circumstances a reasonable jury could find that Titus made this false and misleading statement intending to influence or guide the Ericksons into continuing to do business with DCC, or at least knowing that his statement would have that influence. See Gibb, 518 N.W.2d at 921. The verdict in favor of Erickson and Erickson Land and Cattle on their tort claims is affirmed.

**Skane, Inc.** Harold and Judy Erickson farm near Holdrege and began delivering corn and feeding cattle at the DCC feedlot in the early 1990s. Every year until 1999, Harold would ask a friend at the Bank, Gary Mueller, about DCC; Mueller always said the company was "okay as far as I know." When Mueller left the Bank in early 1999, Harold spoke with Eric Titus and received a similar assurance. In 2000, having heard negative rumors about the Carter Feeders dispute, Harold again asked Titus about DCC. Titus responded "that they were okay" without disclosing what he knew about DCC's condition or that the Bank was out of the credit. Harold testified that he relied on that representation when the Ericksons' corporation, Skane, Inc., stored corn and purchased cattle at DCC later that year.

Titus in the course of his business at the Bank made a gratuitous false or misleading representation that he knew would influence Harold Erickson to enter into contemporaneous cattle feeding transactions with DCC. Although it is unclear what benefit might accrue to the Bank from this misrepresentation, as neither Erickson nor

DCC were Bank customers in 2000, we conclude that the Supreme Court of Nebraska would affirm the jury's verdict holding the Bank liable, at least under a negligent misrepresentation theory, for Skane's pecuniary losses from its transactions with DCC in 2000 -- $61,233.86 in cattle, $33,911.09 in corn, and $77,718.72 in attorneys' fees in the DCC bankruptcy proceedings. See Peck, 766 P.2d at 936, discussing Central States Stamping Co. v. Terminal Equip. Co., 727 F.2d 1405, 1409 (6th Cir. 1984), and citing Ostlund Chem. Co. v. Norwest Bank of Jamestown, 417 N.W.2d 833 (N.D. 1988).

**Clark Nelson.** Nelson farms near Holdrege and was a customer of the Bank for many years when his loan officer, Slominski, introduced Nelson to Damrow in 1995. Nelson began delivering corn and feeding cattle at DCC. Each year, before applying for a loan to feed cattle at DCC, Nelson asked his loan officers, Sterr and Craig DeWalt, whether DCC was a sound company. Each year they responded affirmatively. In August 2000, Nelson applied for a loan from the Bank to purchase a pen of cattle at DCC. Nelson testified that DeWalt again said that DCC was "fine to do business with." Nelson testified that he relied on that assurance in obtaining the loan, purchasing the cattle, and then delivering a portion of his corn crop to DCC to feed the cattle later that year. Nelson did not suffer cattle losses as a result of DCC's bankruptcy, but he lost $22,638.56 on the stored corn. Although Nelson did not claim DeWalt purposely misled him, a reasonable jury could find that DeWalt made a negligent misrepresentation intending to influence customer Nelson into borrowing money from the Bank to enter into contemporaneous transactions with DCC.

**Wells AG Enterprises, BJW Farms, EWW Farms, Inc., Dwayne Kudlacek.** Gary and Bob Wells own and operate Wells AG Enterprises, BJW Farms, and EWW Farms, Inc. Dwayne Kudlacek is Gary Wells's brother-in-law. All farm near Holdrege and were customers of the Bank until some time in 2000 or 2001. Gary Wells delivered corn to the DCC feedlot for many years and began feeding cattle in 1997. Bob Wells began delivering corn to the DCC feedlot in the late 1990s. Kudlacek had the misfortune of first delivering corn to DCC in September, 2000.

-16-

Gary and Bob testified that they annually asked their loan officers at the Bank if it was safe to do business with DCC and were repeatedly assured that it was. In August 2000, Gary asked Eric Titus if it would be safe to take corn to DCC. Titus replied that he was planning on delivering some of his own corn to DCC. Wells inferred it was safe to do so himself and told Bob and Kudlacek that Titus would deliver corn to DCC in August 2000. All three testified they relied on this statement in delivering corn to DCC that fall. Wells AG Enterprises, BJW Farms, EWW Farms, Inc., and Dwayne Kudlacek lost a total of $171,702.19 in corn in DCC's bankruptcy.

Titus's August 2000 statement to Gary Wells cannot be the basis for these plaintiffs' tort claims because it was a statement of present intent, and there is no evidence that Titus, who personally fed bison at DCC that year, misrepresented his intention. Nor did that statement require the disclosure of what Titus knew as DCC's former loan officer in order to make it not misleading. None of the Wells plaintiffs relied on any other representations by the Bank when they did business with DCC in late 2000. Accordingly, they failed to prove that they would not have entered into the loss-causing transactions in the absence of a false representation or non-disclosure by the Bank. See Luscher v. Empkey, 293 N.W.2d 866, 868 (Neb. 1980). The district court erred in denying the Bank's motion for judgment as a matter of law on their tort claims.

The remaining plaintiffs did not rely on alleged misrepresentations or non-disclosures by the Bank in 2000, the year they entered into the corn and cattle transactions with DCC that caused them pecuniary loss in DCC's bankruptcy.

**Dixon Granstra and DG Farms, Inc**. Dixon Granstra and DG Farms, Inc., operate out of Sheldon, Iowa. Neither has ever been a customer of the Bank. Granstra began feeding cattle with DCC in the late 1980s and fed millions of dollars worth of cattle at the feedlot before 2001. In 1999, Damrow told Granstra that he had "taken a position" on eighty loads of cattle on the Chicago Mercantile Exchange. Concerned

-17-

at the magnitude of this risk, Granstra asked his Iowa banker, Jerry Adams, to inquire of the Bank whether Damrow could handle the risk. Adams called loan officer Sterr who said that DCC was a "good customer," "excellent quality," and "sound." After talking with Adams, Granstra testified that he decided to continue doing business with DCC. In July 2000, Granstra and DG Farms Inc., purchased lots of cattle at DCC.[9] They incurred substantial losses in the DCC bankruptcy, including a $297,000 settlement with the DCC trustee for an alleged preference payment to Granstra in December 2000.

Granstra and DG Farms, Inc., rest their tort claims on what loan officer Sterr told banker Adams in 1999. Plaintiffs contend there was ample evidence that Sterr knew of negative financial and credit issues at DCC.[10] Therefore, he was guilty of at least negligent misrepresentation when he gave false or incomplete information to Adams. However, the Granstra plaintiffs cannot recover because no reasonable person would expect Sterr's statements in mid-1999 to influence cattle investors the following year.

Plaintiffs' expert, Dr. Jones, testified to the volatility of this market, where prices fluctuate significantly within a matter of months. Jones testified that financial information about a cattle feeding operation can become unreliable even during a single four-five month cattle feeding cycle. Thus, in this investment market, there is a rather short limit on the period of time in which a banker making a general statement that a feedlot customer is a "safe place to do business" or is "sound" or is an "excellent credit" would intend or expect that statement to influence an inquiring

---

[9]Granstra did not testify that he specifically relied upon information from the Bank when he purchased lots of cattle with Damrow in 2000.

[10]As loan officer for the Damrow and Carter entities from 1994 until he left the Bank in late 1999, Sterr received a daily loan report that alerted him to overdrafts, also tracked past-due DFF notes, and analyzed the negative internal report in 1997 of multiple problems and possible abuses with the Damrow credits.

third-party contemplating cattle or corn transactions with the feedlot. Whether or not the banker expects that the bank will participate in the third party's transactions, his misrepresentation or non-disclosure, whether fraudulent or merely negligent, does not have the requisite relationship to the third party's much later, loss-causing transaction to be tortious, particularly a transaction occurring after the bank is no longer financing the customer. See Restatement (Second) of Torts, §§ 531, 551(2)(e), 552(2)(b). Although the relevant time period will often be a question of fact for the jury, no reasonable jury could find that Sterr's statement in mid-1999 was intended to influence or could be expected to influence the Granstra plaintiffs' cattle purchases in late 2000. Accordingly, the district court erred when it denied the Bank's motion for judgment as a matter of law on the tort claims of Granstra and DG Farms, Inc.

**Don Sjogren.** Don Sjogren owns and operates two farms adjacent to the DCC feedlot; he fed cattle and delivered corn from the day it opened. Sjogren also was a customer of the Bank until 2001. In June 1999, a DCC check written by Damrow to Sjogren for a pen of cattle was rejected by the Bank and mailed to Sjogren with an n.s.f. notice. Concerned, Sjogren asked Bank president Riley if anything was wrong with DCC. Riley left the room to inquire, then returned and told Sjogren it was a clerical error and that DCC was a good place to do business. Sjogren testified he bought two pens of cattle in 1999 after hearing Riley's assurance. He did not testify that Riley's June 1999 assurance led him to purchase cattle and store grain at DCC in the fall of 2000. Sjogren lost $312,411.50 in cattle, $39,404.70 in corn, and $16,707.25 in attorney's fees as a result of his 2000 transactions with DCC.

Although the jury reasonably found that Riley's statement to Sjogren was fraudulent or at least negligent,[11] Sjogren's loss-causing transactions with DCC were

---

[11]Riley made that statement even though DCC was assigned the Bank's second highest risk rating for most of 1999 and had been placed on the Bank's watch list just a day earlier. Had Sjogren lost money on the cattle he bought in 1999 relying on Riley's misrepresentation and non-disclosure of the true reason for the n.s.f. check,

too remote in time from Riley's June 1999 statement to give rise to actionable claims for misrepresentation or non-disclosure. Without a false statement more closely related to the transactions with DCC that caused Sjogren's damages, and absent any testimony that Sjogren relied upon Riley's statement when he entered into the loss-causing transactions, he cannot recover for the Bank's misrepresentation. Therefore, like the Granstra plaintiffs, the district court erred when it denied the Bank's motion for judgment as a matter of law on Sjogren's tort claims.

**Theodore Collin.** Collin was employed by the Bank as a loan officer and vice president from 1983 until January 2000, when he left to work at another bank in Holdrege. Collin began delivering corn and feeding cattle at DCC in 1993. In the fall of 2000, Collin delivered corn and bought cattle at DCC. He lost $22,501.59 in cattle, $27,766.16 in corn and spent $1,216.00 in attorney's fees as a result of these transactions in DCC's bankruptcy.

Collin's claims fail as a matter of law. As a member of the Bank's loan committee from 1990 through early 1998, Collin was aware of DCC overdrafts and past-due DFF notes. Slominski and Sterr explained that the Bank used the overdrafts to limit DCC spending, and the past-due notes were cattle feeder timing issues. Collin testified that he expected Sterr to advise if there were any financial concerns with DCC. But neither Collin nor any other witness testified that the Bank ever supplied Collin false information for the purpose of influencing his DCC investments. Instead, he claimed that Slominski and Sterr misled him during loan committee meetings. The Bank's knowledge that Collin was also a DCC investor does not transform information shared during loan committee meetings into business guidance for purposes of a fraudulent or negligent misrepresentation claim.

---

the Bank would have been liable for that loss. See Gibb, 518 N.W.2d at 921. But, according to expert Jones, 1999 was a profitable year to feed cattle.

Without evidence the Bank supplied information to guide or influence Collin's personal transactions, he cannot maintain an action for negligent misrepresentation. See Farr v. Designer Phosphate & Premix Int'l, Inc., 570 N.W.2d 320, 326 (Neb. 1997) (§ 552 requires "that one supplying the misrepresentation must *intend* to supply the information and that such person must *intend* that the information will induce reliance and influence the transaction") (emphasis in original). Nor did Collin present evidence giving rise to a duty to disclose under § 551(2) after he began working for a competing bank and the Bank terminated its relationship with DCC.

Collin's claim of fraudulent misrepresentation required proof that he reasonably relied on knowingly false representations by Slominski and Sterr at the loan committee meetings. In addition to the timing issue that is fatal to the Granstra and Sjogren claims, the independent information available and known to Collin compels the conclusion that he could not have reasonably relied on the loan committee statements when he did business with DCC in the fall of 2000. After leaving the Bank in early 2000, Collin did a comprehensive analysis of DCC and DFF for his new employer and personally inspected cattle at the feedlot. With this information in hand, no reasonable jury could find that Collin instead relied on statements made in loan committee meetings from years earlier when he decided to do business with DCC in the fall of 2000. See generally Schuelke v. Wilson, 549 N.W.2d 176, 181-83 (Neb. 1996). The district court erred when it denied the Bank's motion for judgment as a matter of law on Collin's tort claims.

**Dave Dahlgren and Dahlgren's, Inc.** Dave Dahlgren and his family's corporation began delivering corn and feeding cattle at the DCC feedlot in the early 1980s. Both were also customers of the Bank until March 2000. Every February from 1995 through 1999, during a review conducted by Dahlgren's loan officer, Ted Collin, Dahlgren would ask if it was a good idea to continue doing business with DCC. Collin replied to each inquiry, in substance, "Well, you know, I wouldn't be doing business there if I didn't think it was okay also." Dahlgren testified that he relied on Collin's statements when he delivered corn to DCC in the fall of 2000, and purchased

-21-

cattle on November 9, 2000. Dahlgren and Dahlgren's Inc., incurred substantial losses on these transactions in the DCC bankruptcy.

At trial, Dahlgren did not testify that co-plaintiff Collin, his only source of DCC financial information at the Bank, ever conveyed a fraudulent representation about DCC's financial condition or dealings with the Bank. For this reason, as well as the timing issue discussed above, the Dahlgren plaintiffs' tort claims fail as a matter of law. Without evidence that Collin made statements of fact either knowing they were false, or recklessly ignoring their truth or falsity, the Dahlgren plaintiffs cannot sustain their fraudulent misrepresentation claims against the Bank. See Four R Cattle Co., 570 N.W.2d at 816-17. Nor can Slominski's and Sterr's statements made to Collin at loan committee meetings support the Dahlgren plaintiffs' fraud claims absent evidence these Bank officers intended that Dahlgren and his corporation, as well as Collin, would rely on them. The fraudulent concealment and negligent misrepresentation claims falter on the specific nature of Collin's annual reassurance, "I wouldn't be doing business there if I didn't think it was okay also." These were statements of personal opinion and present intent that did not, without a more specific inquiry from Dahlgren related to particular transactions he was contemplating, impose a duty to disclose the details of a customer's financial affairs known to Collin as a loan officer of the Bank. For all these reasons, the district court erred when it denied the Bank's motion for judgment as a matter of law on the Dahlgren plaintiffs' tort claims.

## IV. An Evidentiary Issue

Over the Bank's timely objection, the district court allowed FNBO and Adams Bank & Trust witnesses to testify that those banks sued the Bank for withholding information about DCC and that the Bank settled those claims, but not the amount of the settlements. The Bank argues that the district court abused its discretion in allowing plaintiffs to elicit this testimony. The Bank relies on Federal Rule of Evidence 408 which provides in relevant part:

-22-

Evidence of the following is not admissible on behalf of any party, when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount . . . furnishing or offering or promising to furnish -- or accepting or offering or promising to accept -- a valuable consideration in compromising or attempting to compromise the claim.

Plaintiffs respond -- quite correctly -- that Rule 408 as written only applies to evidence of compromise offered to prove liability for or the amount of the claim that was compromised, whereas here evidence that the Bank settled claims by its successor lenders was offered to refute the Bank's claim that it was not liable for *plaintiffs'* tort claims. This textual limitation has led our sister circuits to differ somewhat on whether Rule 408 applies to evidence of compromises or offers to compromise claims by third parties. Compare Zurich Am. Ins. Co. v. Watts Indus., Inc., 417 F.3d 682, 688-90 (7th Cir. 2005), and cases cited, with Hudspeth v. Commissioner, 914 F.2d 1207, 1213-14 (9th Cir. 1990), and the cases cited in Lo Bosco v. Kure Eng'g Ltd., 891 F. Supp. 1035, 1037-39 (D.N.J. 1995). We have not examined the issue in depth, but our decision in Vulcan Hart Corp. v. NLRB, 718 F.2d 269, 276-77 (8th Cir. 1983), though distinguishable, viewed the scope of Rule 408 narrowly.

As Judge Learned Hand explained years ago, the admission of evidence that a defendant settled a claim with a third party arising out of the same set of operative facts carries the inherent risk that "such a concession of liability is almost sure to be taken as an admission of fault." Paster v. Pennsylvania R.R., 43 F.2d 908, 911 (2d Cir. 1930). For this reason, even the circuits that construe Rule 408 narrowly view evidence of third party settlements skeptically. As the Tenth Circuit explained in Towerridge, Inc. v. T.A.O., Inc., 111 F.3d 758, 770 (10th Cir. 1997), "Rule 408 does not require the exclusion of evidence regarding the settlement of a claim different from the one litigated, though admission of such evidence may nonetheless implicate the same concerns of prejudice and deterrence of settlements which underlie Rule 408" (internal citations omitted). We agree.

We review the district court's evidentiary rulings for abuse of its substantial discretion, reversing only if we conclude there was a prejudicial abuse of that discretion that affected the Bank's substantial rights. See Crane v. Crest Tankers, Inc., 47 F.3d 292, 294-96 (8th Cir. 1995); Fed. R. Civ. P. 61. The Bank argues that it was prejudiced because the settlement evidence undermined its claim at trial that DCC was a satisfactory credit risk in early 2000, when FNBO and Adams Bank took over the credit. However, even absent the evidence of settlement, this claim would have been undermined by the admissible testimony of FNBO and Adams Bank witnesses that the Bank failed to disclose negative information about DCC and that the successor banks had sued the Bank for their losses in the DCC bankruptcy. The district court took steps to avoid unfair prejudice by excluding the amounts of the settlements and the settlement documents, and counsel for plaintiffs did not refer to the settlements during closing argument. Finally, and perhaps most importantly, the issue is now limited to the fraud claims of plaintiffs Erickson, Erickson Land and Cattle, Nelson, and Skane, Inc., claims we have affirmed because the Bank made negligent misrepresentations about DCC's financial condition after DCC was no longer a customer. In these circumstances, the admission of limited settlement evidence was not a clear and prejudicial abuse of discretion.

## V. Conclusion

For the foregoing reasons, the judgment of the district court is affirmed in part and reversed in part. The award of treble damages to each plaintiff and $1,095,263.00 in attorneys' fees under RICO is reversed. The awards of tort damages to Dave Dahlgren; Dahlgren's, Inc.; Theodore Collin; Dixon Granstra d/b/a Granstra Cattle; DG Farms, Inc.; Wells Ag Enterprises, Inc.; Don Sjogren; BJW Farms, Inc.; EWW Farms, Inc. and Dwayne Kudlacek are also reversed, and all claims of these plaintiffs are dismissed. The awards of tort damages to Lloyd Erickson ($66,393.58); Erickson Land and Cattle ($96,220.28); Skane, Inc. ($172,863.67); and Clark Nelson ($22,638.56) are affirmed.

_____