# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-2901

_____

| | | |
|---|---|---|
| Equal Employment Opportunity Commission, | * | |
| | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| Rodney Graves, | * | |
| | * | |
| Intervenor Plaintiff - | * | |
| Appellant, | * | Appeal from the United States |
| | * | District Court for the Western |
| v. | * | District of Missouri. |
| | * | |
| UMB Bank Financial Corporation, | * | |
| doing business as UMB Bank, | * | |
| | * | |
| Defendant - Appellee. | * | |

_____

Submitted: June 9, 2008
Filed: March 13, 2009

_____

Before MELLOY, BEAM, and BENTON, Circuit Judges.

_____

MELLOY, Circuit Judge.

Intervenor-Plaintiff Rodney Graves appeals following a jury verdict in favor of Defendant UMB Financial Corporation ("UMB") on his discrimination claim under the Americans with Disabilities Act, 42 U.S.C. §§ 12101–12213 ("ADA"). Graves alleges error regarding several evidentiary rulings and regarding the district court's

denial of a motion for a new trial based on those rulings. Plaintiff Equal Employment Opportunity Commission ("EEOC") does not appeal. We affirm.

I.     Background

Graves became quadriplegic after breaking his neck during a high school football game. His quadriplegia is incomplete; he does not have voluntary leg movement, but he has sensory feeling and partial arm movement. Graves uses a tilting, reclining, motorized wheelchair, and he is able to manipulate a splint on his left hand to use a computer mouse and keyboard, feed himself, brush his teeth, and conduct other similar activities.

After high school, Graves graduated from college and attended graduate school, completing course work towards a master's degree in economics. He typed his own papers as a student. Prior to applying for a job with UMB, Graves obtained many years' experience in customer service in positions that required talking to customers on the phone while typing information into, and retrieving information from, computers. He left his immediately prior employment due to health conditions that required surgeries, and when he was able to return to work, the employer was facing layoffs.

Graves sought different employment through the assistance of Rochelle Mitz, a job counselor with the organization I AM CARES, a group that works with disabled clients to help place them in jobs. UMB previously had worked with I AM CARES to place job applicants, and Mitz knew of this history. Mitz's supervisor suggested that she contact William Hawkins at UMB to ask about possible job openings. Hawkins had been blind since birth, and I AM CARES had helped Hawkins obtain his job at UMB twelve years prior.

At the time Mitz first approached UMB on Graves's behalf, UMB's customer-service call center was divided into an Inbound Department to handle incoming calls from existing bank customers and an Outbound Department for making outgoing sales calls. Hawkins was the manager of the Outbound Department, and Claudia Farrell was the manager of the Inbound Department. The managers had responsibility for hiring within their respective departments.

In 2002, Mitz and Graves had two in-person meetings with Hawkins. At the second of these meetings, Graves observed Customer Service Agents in the Outbound Department performing their duties. Graves and Mitz told Hawkins that Graves's ability to type was limited such that he might need adaptive equipment such as voice-activation software to enable him to perform the job of Customer Service Agent in the Outbound Department. Such software would allow him to speak into the computer rather than type into the computer.

Following the meeting, Hawkins met with Jeff Osenga. Osenga was an Information Technology Project Manager for the call center, and he previously had worked with Hawkins to provide accommodations for other employees. Osenga told Hawkins that voice-activation software would not work with the call center's computer systems. At that point, Hawkins believed Graves could not type as required for a job in the Outbound Department and recommended that Graves be considered for a job in the Inbound Department, where Hawkins believed less typing would be required.

Graves and Mitz next met with Andrea Shelby in UMB's Staffing Department to fill out an application. Graves told Shelby that other employers had waived typing tests for him, and Shelby waived the standard typing test she normally administered to applicants. Graves took other standard tests Shelby normally administered, and Shelby sent his test scores to the call center. Graves mentioned voice-activation software to Shelby at this meeting.

-3-

Next, Graves and Mitz interviewed with two supervisors in the Inbound Department, Jeff Limpic and Donna Davis. At the interview, Graves or Mitz stated Graves would need voice activation software to perform in the Inbound Department. Subsequently, Farrell (manager of the Inbound Department) consulted with Hawkins regarding voice-activation software and regarding why such software would not work in the Outbound Department. Farrell concluded such software also would not work in the Inbound Department and Graves, therefore, was not qualified for a position in her department.

In spring 2003, Graves filed a disability discrimination charge with the EEOC. EEOC investigator Mark Bretches investigated the charge and soon learned that UMB believed Graves required voice-activation software in order to serve as a Customer Service Agent, although Graves asserted to Bretches that no such accommodation would have been necessary. Eventually, in March 2004, Bretches informed Shannon Johnson, a UMB Human Resources Officer, that he had discovered this discrepancy. In September 2004, Johnson sent a letter to Graves, stating "there was a misunderstanding concerning your ability to perform the essential functions of that position." In the letter, Johnson invited Graves to meet with her and explore the possibility of a position in the call center "and also other positions" that were available. Graves did not respond to Johnson. On April 15, 2005, Johnson sent another letter to Graves, stating, "Based on new information that has recently come to light, there is no longer a confusion about your need for voice activated software. As a result, I am pleased to offer you the position of Sales & Service Agent at UMB Bank effective May 2, 2005." The letter contained terms setting out the details of an offer for work at a wage rate of $11.10 per hour. Graves declined the offer.

Eventually, Graves and the EEOC brought this suit against UMB. At trial, Graves's theory of the case was that UMB's alleged misunderstanding regarding his need for voice-activation software was untrue and was a pretextual explanation to hide

a discriminatory motive.[1] The trial largely came down to a credibility assessment for the jury pitting Graves and Mitz, on the one hand, against the relevant employees at UMB, on the other. Graves argued he was badly mistreated and denied opportunities by UMB's employees who knew his limitations and knew the scope of any required accommodations. UMB argued that it had an admirable record of hiring disabled persons and that it failed to hire Graves because it believed he required a specific accommodation—voice-activation software—that was inconsistent with UMB's various computer systems.

At trial, Graves asserted that the case was not a case about money and that he was fighting to ensure others would not be treated as he had been. UMB adopted the tactic of arguing to the jury that the case, in fact, was about money. UMB argued that Graves was not genuinely interested in obtaining the Customer Service Agent job that paid approximately $11 per hour, but rather, he was seeking a windfall judgment of millions of dollars. In fact, in closing arguments, Graves's attorney asked the jury to find in his favor and award him $3 million. Ultimately, the jury found in favor of UMB as to the question of liability, finding no discrimination and accepting UMB's characterization of the case as involving a misunderstanding between the parties as to the extent of any required accommodation.

All of the issues currently on appeal stem from the district court's evidentiary rulings. Several of the issues relate to the EEOC investigation and documents or testimony Graves characterizes as evidence of his settlement and conciliation positions throughout the EEOC investigation. Graves argues that the district court improperly admitted this evidence and that UMB successfully relied on this evidence

---

[1]In this regard we note that we have presented the facts in a light most favorable to the verdict, Craig Outdoor Adver., Inc. v. Viacom Outdoor, Inc., 528 F.3d 1001, 1009 (8th Cir. 2008), cert. denied, 129 S. Ct. 1000 (2009), and that the parties hotly contested the questions of whether and to what extent Graves and Mitz had expressed an inability to perform in the desired positions without voice-activation software.

to convince the jury Graves was a non-credible and unreasonable plaintiff seeking an award that was out of proportion with the wrong he alleged and job he sought.

Another contested evidentiary issue involved testimony from Bretches regarding the EEOC investigation. Graves argues UMB should not have been allowed to question Bretches regarding the EEOC investigation. UMB argues Graves opened the door to this topic by denigrating the job offer from UMB and asserting that UMB knew all along that Graves did not require accommodation through voice-activation software. UMB sought to show that Bretches delayed substantially between the time he learned Graves's position regarding the software and the time he communicated this position to UMB, and that UMB reached out to Graves after learning of the misunderstanding.

Another contested evidentiary issue concerned the admission of a portion of an internal UMB investigative file as a business record and the admission of related testimony. Specifically, the district court admitted a memorandum containing Hawkins's answers to questions Johnson asked him during an internal investigation. The district court also permitted Johnson to testify regarding various statements from Hawkins. Johnson asserted the file was a record she kept in the ordinary course of business while carrying out her role of investigating and documenting claims. Graves asserted the file was a document created in preparation for litigation, its contents were hearsay, and it did not satisfy the business-record exception to the hearsay rule.

In addition, Graves argues the district court improperly permitted UMB to present evidence regarding its record of hiring disabled individuals within departments other than the call center. Finally, Graves argues the district court improperly precluded him from presenting evidence regarding an instance of UMB's alleged discrimination against a different person. We address in detail below the additional facts relevant to each of these evidentiary issues.

II.     Discussion

We review the district court's evidentiary rulings for abuse of discretion, Nichols v. Am. Nat'l Ins. Co., 154 F.3d 875 (8th Cir. 1998), and we may grant relief "only if we conclude there was a prejudicial abuse of that discretion that affected [Graves's] substantial rights." Dahlgren v. First Nat'l Bank of Holdrege, 533 F.3d 681, 700 (8th Cir. 2008), cert. denied, 129 S. Ct. 1041 (2009); see also Sprint/United Mgmt. Co. v. Mendelsohn, 128 S. Ct. 1140, 1144–45 (2008) ("In deference to a district court's familiarity with the details of the case and its greater experience in evidentiary matters, courts of appeals afford broad discretion to a district court's evidentiary rulings.").

A.      Testimony Purportedly Attacking EEOC Investigation

We reject Graves's argument that the district court improperly allowed testimony explaining and attacking Bretches's EEOC investigation. Rather, we believe that Graves's attorney, and Graves himself through his own testimony, opened the door to Bretches's challenged testimony. In her opening statement, counsel for Graves referred to the April 2005 offer of employment from UMB and argued UMB had taken inconsistent positions regarding Graves's qualifications. Counsel stated:

> Now I think also interesting they want him to take a typing test because you will hear from Miss Shelby Mr. Graves was not hired for a customer services job in 2002, but after Mr. Graves filed a lawsuit in this case, after he alleged he felt like he was discriminated against for not being hired because of his disability, in 2005 he will be offered a job in the customer service center and when he made that job offer he had never taken a typing test with them. So they want to have it both ways, they want to say we didn't hire him in 2002 because he wasn't qualified but then they say we thought he was qualified and offered him a job in 2005 after he filed this lawsuit.

-7-

Later, during direct examination, Graves himself stated, "So after someone treats you like that and then some three years later because of pending litigation all of a sudden they realize you don't need voice-activation software, that's a little bit difficult for me to trust." Taken together, we believe Graves's arguments, including these statements, fully called into question UMB's motives and explanation for sending Graves the September 2004 invitation to apply and the April 2005 offer of employment. UMB's argument at trial was that there was a misunderstanding regarding Graves's need for the voice-activation software and that Bretches did not inform UMB of Graves's position until long after he initiated his investigation. UMB was entitled to question Bretches to explain UMB's discovery of the discrepancy and to tie this discovery to the timing of the efforts to reach out to Graves. We have held the admissibility of administrative proceedings in subsequent civil litigation is committed to the discretion of the district court. See Doss v. Frontenac, 14 F.3d 1313, 1318 (8th Cir. 1994). In the present circumstances, we find no abuse of discretion.

### B. Exhibits 6, 7, 8, and 69

Graves alleges that, at trial, the district court allowed UMB to present evidence and elicit testimony regarding his settlement and conciliation position during the EEOC investigation period in violation of Federal Rule of Evidence 408 and in violation of statutory protections afforded such information by the ADA. See 42 U.S.C. § 12117(a) (incorporating by reference section 706(b) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(b), which, in turn, provides: "Nothing said or done during and as a part of such informal endeavors may be made public by the Commission, its officers or employees, or used as evidence in a subsequent proceeding without the written consent of the persons concerned."). The evidence in question includes Exhibits 6, 7, 8, and 69.

Exhibits 6, 7, and 8 are different versions of typed settlement and conciliation demands or position statements Graves provided to Bretches. These documents were entitled "Economic General/Compensatory Damages Proposal" and they listed an estimate of lost salary damages as follows, "Economic damages from lost salary adjusted for inflation, and work life expectancy equals $796,026.01." They also listed a grand total of overall damages of about $3.1 million. Graves asserts he created Exhibits 6, 7, and 8 and shared them with Mitz to obtain her input before providing a proposal to Bretches. Graves did not share Exhibits 6, 7, or 8 with UMB during the EEOC investigation, conciliation or settlement process.

Exhibit 69 is a small piece of memo pad paper containing handwritten notes. Graves alleges he did not share this document with UMB during the EEOC investigation, conciliation or settlement process, but rather, it was a note Mitz created when he talked to her one day after Bretches asked him for information about his settlement position. The notes on Exhibit 69 are difficult to read; words and phrases are written in lines that run into one another; and a number appears with commas inserted in an improper and confusing manner. The document states, on an approximate line-by-line basis: "3/26/04 Rodney," "EEOC," "file a case," "against UMB," "restablish [sic] new law," "determination letter," "$7–8,00,000 [sic] general economic loss," "pension benefit, 20 year interest," "medical benefit," and "compensatory – 300,000 cap." There also appears to be reference to a percentage written near the phrase "20 year interest."[2]

Graves moved to exclude all four documents. The court ruled that Exhibits 6, 7, and 8 were to be excluded under Federal Rule of Evidence 408, but that the handwritten note, Exhibit 69, was not a settlement offer and was admissible. The

---

[2] We note that, given the placement of commas in his numbers (7-8,00,000) it would be reasonable to interpret the number range appearing near the phrase "general economic loss" as seven to eight million (7-8,000,000) or seven to eight hundred thousand (7-800,000).

court stated, however, that it would be "totally inappropriate" to show the jury that portion of Exhibit 69 with an apparent reference to a $300,000 statutory cap. See 42 U.S.C. § 1981a(c)(2) ("[T]he court shall not inform the jury of the limitations described in subsection (b)(3) of this section.").

During UMB's cross-examination of Mitz, UMB placed Exhibit 69 into evidence, and Mitz identified the handwriting on the note as her own. Notwithstanding the court's earlier statement regarding the statutory cap, UMB placed the document on a courtroom projection device without covering the line that read "compensatory – 300,000 cap." Graves failed to make a timely renewal of his objection based on UMB's full publication of the document, but he eventually made a record of the fact that UMB had presented the note in unredacted form. When Graves raised this point, the court noted Graves's failure to make a contemporaneous objection and took no curative action.[3]

Ultimately, UMB capitalized on the confusing placement of commas in the numbers shown on the note to draw out testimony describing the note as possibly showing a description of potential damages of $7–8 million. Graves argues this was harmful and prejudicial because it played into UMB's theory of the case that Graves was trying to obtain a windfall through his suit against UMB and was, therefore, not a credible litigant.

---

[3]Regarding this apparent reference to a $300,000 statutory cap, we find the portion of the transcript dealing with this issue to be confusing. Ultimately, however, it is clear Graves did not make a contemporaneous objection when UMB published the exhibit in its unredacted form. Importantly, no attorney or witness appears to have drawn the jurors' attention to this portion of the document. Because the jury did not reach the question of damages, and because this portion of Exhibit 69 does not fit into the theory of harm discussed herein as to the possible harm or prejudice related to admission of Exhibit 69, we find no basis for relief related to this publication of a possible reference to a statutory cap.

-10-

The text of Rule 408 precludes admission of "evidence of . . . conduct or statements made in compromise negotiations regarding the claim." Fed. R. Evid. 408. The parties agree that Rule 408 clearly excludes offers of settlement actually communicated between the parties. The parties dispute the extent to which the Rule requires the exclusion of other, supporting documents not communicated to the opposing side. UMB argues we should interpret Rule 408 narrowly as being strictly limited to an offer or acceptance of settlement such that the admission of Exhibit 69 was permissible. Graves seeks to apply Rule 408 in a broader manner to preclude the admission of documents supporting the settlement process.

The spirit of the Rule, as recognized by several circuits and as set forth in the commentary to the Rule, supports the exclusion of certain work product, internal memos, and other materials created specifically for the purpose of conciliation, even if not communicated to the other party. See Advisory Committee Notes on Fed. R. Evid. 408 (stating the purposes of the rule are to foster open discussions and out-of-court settlements and to guard against the admission of evidence that may not fairly represent the actual value or merits of a claim, including not just offers, but "expansion of the rule . . . to include evidence of conduct or statements made in compromise negotiations, as well as the offer or completed compromise itself"); id. (stating that the Rule applies to evidence for both parties as "[t]he protections of Rule 408 cannot be waived unilaterally because the rule, by definition, protects both parties from having the fact of negotiation disclosed to the jury"); Affiliated Mfrs., Inc. v. Alum. Co. of Am., 56 F.3d 521, 528–30 (3d Cir. 1995) (holding that Rule 408 applies to internal memoranda regarding compromise negotiations even though not communicated to the opposing party); Blu-J, Inc. v. Kemper C.P.A. Group, 916 F.2d 637, 641–42 (11th Cir. 1990) (holding that an accountant's report prepared for the purpose of compromise negotiations was properly excluded); Ramada Dev. Co. v. Rauch, 644 F.2d 1097, 1106–07 (5th Cir. 1981) (holding an internal report made "in the course of an effort to compromise" was properly excluded under Rule 408). We find the commentary and these cases persuasive, and we agree that it is appropriate to

view Rule 408 as being sufficiently broad to encompass certain material in addition to actual offers of settlement.

That having been said, the present case does not require us to define precisely what the limits of the Rule may be. The only suggestion in the record as to the function of the handwritten memo is that it was a document memorializing notes that Mitz, the job counselor, took during discussions with Graves the day after Bretches, the EEOC investigator, asked Graves about his damages as part of the conciliation process. There is nothing in the record tending to indicate Exhibit 69 was unrelated to the conciliation process, and given Mitz's and Bretches's roles in this case, we believe Rule 408 applies to the note.

UMB argues exceptions to Rule 408 apply and excuse admission of the note in this case. We need not address any such exclusions, however, because any error in the admission of Exhibit 69 was harmless. Graves lost at trial as to liability, and the jury never reached the question of damages, where improperly admitted references to dollar amounts more clearly would be material. As such, the improperly admitted evidence regarding the calculation or estimation of damages could only be harmful to the extent it reflected upon Graves's motivations for bringing suit and upon his credibility. In other words, the jury might have viewed Graves as non-credible, unreasonable, and greedy based on the suggestion that he had speculated the case might be worth $7–8 million in discussions with his job counselor. A review of the transcript makes it apparent that UMB asserted this theory at trial. The question for the purpose of our harmless error analysis, then, is whether the incremental impact this evidence may have had on the jury's credibility assessment regarding Graves was more than slight. See McKnight v. Johnson Controls, Inc., 36 F.3d 1396, 1405 (8th Cir. 1994) ("[T]he error is harmless only if 'the error did not influence or had only a slight influence on the verdict.'" (quoting United States v. DeAngelo, 13 F.3d 1228, 1233 (8th Cir. 1994))).

In addressing this question, we find it important in this case that Graves's attorney expressly asked the jury to award Graves over $3 million based on the denial of a job that paid approximately $11.00 per hour. Also, given the $3 million request, the figures contained on Exhibit 69 could only have buttressed UMB's theory if the jury, in fact, interpreted the scribbles on the note as $7–8 million rather than as $700,000–$800,000. Further, even assuming the jury concluded that Exhibit 69 stated $7–8 million, we would have to conclude that the jury would not have found that the express $3 million request impacted Graves's credibility but that the purported $7–8 million estimate did impact his credibility. In other words, to find harm, we would have to conclude that the jury might have found for Graves as to credibility and on the issue of liability had the overt request for $3 million been the only suggested award, but that the jury decided to hold against Graves on the issue of credibility and the ultimate issue of liability because he earlier speculated as to the higher amount of $7–8 million.

Because UMB's same theory of unreasonableness and lack of credibility exists whether we consider Graves's overt request for $3 million or the potentially wrongly inferred and speculative $7–8 million figure, we find admission of the evidence was harmless. Any time a plaintiff makes a request for a substantial award before the question of liability is resolved, there is a risk the jury may find that the size of the request provides insight as to the plaintiff's reasonableness and credibility. We believe that risk existed in this case based on the overt $3 million request just as it may have based on the possible $7-8 million estimate. Ultimately, then, any possible harm in this instance was incremental harm that comes down to a matter of degree. Any such harm could only have been slight, and in accordance with McKnight, 36 F.3d at 1405, is not a basis for reversal.

C.  Admission of Exhibit 16 as a Business Record

UMB Human Resources employee Shannon Johnson conducted an investigation and assisted EEOC investigator Bretches in his investigation. Johnson interviewed Hawkins in August 2004 and took notes during the interview. The district court permitted UMB to place those notes into evidence as Exhibit 16. When Graves objected to the admission of Exhibit 16 on grounds of hearsay, UMB argued the notes were a business record that satisfied the business-record exception. See Fed. R. Evid. 803(6) (excepting from the hearsay exclusionary rule "[a] memorandum . . . made at or near the time by . . . a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum"). Johnson testified that she conducts such interviews and maintains notes from such interviews as a part of her normal duties as a human resources employee for UMB. The district court permitted Exhibit 16 to come into evidence.

We recognize the slippery slope presented by the admission of evidence such as Exhibit 16. Although Johnson created the notes contemporaneously with her 2004 interview of Hawkins, she did not create the notes at or near the time Hawkins interacted with Graves in 2002. These interactions were the subject matter Johnson and Hawkins addressed in their conversation, as documented in the notes, but she did not interview Hawkins until after Graves filed a complaint with the EEOC. Had Hawkins been unavailable or had the notes been necessary to rebut an in-court accusation of recent fabrication, admissibility easily could be justified on other grounds. Here, however, Hawkins was available to testify, he did, in fact, testify, and it is not clear what value the notes held that required their admission. Arguably, the notes buttressed Hawkins's testimony. While it may be a prudent and regular business practice to conduct internal investigations when learning of civil claims or administrative or criminal investigations, and while notes from such investigations

-14-

undoubtedly may be valuable and admissible in certain contexts, we have difficulty finding that Exhibit 16 fits within the Rule 803(6) exception.

Regardless, we believe any error in admission of the notes was harmless. Hawkins had stopped being an employee with UMB approximately four years prior to trial, and the parties deposed him in 2005. His deposition testimony addressed the matters referenced in Exhibit 16, namely hearsay statements from Hawkins discussing interactions with Graves, Mitz, Osenga, and others surrounding the time of Graves's application with UMB. Graves called Hawkins as a witness at trial in 2007 and questioned him as to the events that took place in 2002. Graves and Mitz also testified at trial regarding the events addressed in the notes.

Graves argues the notes improperly buttressed or contradicted Hawkins's trial testimony. He also argues the court permitted UMB to introduce the notes after Graves had already finished examining Hawkins, such that he was denied the opportunity to question Hawkins about the notes. Even considering Graves's arguments, we find no prejudice. The notes generally were consistent with Hawkins's testimony, but the format provided little in the way of details describing Hawkins's responses to Johnson's questions. Graves did not attempt to recall Hawkins when UMB introduced Exhibit 16, and as such, his claims of prejudice ring hollow. Graves had ample opportunity at trial to question Hawkins and elected not to recall him to address any potential prejudice from the memo. Given the limited value of the notes, we cannot conclude that its admission, if erroneous, caused any prejudice to Graves's substantial rights. Dahlgren, 533 F.3d at 700.

        D.     Evidence Regarding UMB's Past Hiring of Disabled Employees and Evidence Regarding Another Employee's Allegation of Discrimination

Finally, Graves argues it was error to allow testimony regarding UMB's history of hiring Hawkins and several other disabled individuals in its location that included

the call center, but to exclude evidence of another person's pending allegations of disability discrimination against UMB. These arguments are without merit. Background evidence with proper foundation concerning an employer's general practices may be relevant to help a jury determine whether a proffered explanation is more likely true or pretextual. See McPheeter v. Black & Veatch Corp., 427 F.3d 1095, 1101 (8th Cir. 2005); Phillip v. ANR Freight Sys., Inc., 945 F.2d 1054, 1056 (8th Cir. 1991). In fact, in a recent decision involving admission of background evidence regarding an employment discrimination defendant's treatment of other employees, the Supreme Court emphasized the need for deference towards a district court. Sprint/United Mgmt. Co., 128 S. Ct. at 1145-47.

Moreover, Graves presented arguments that invited such evidence when he attacked UMB generally, in a manner suggesting discriminatory practices broader in scope than the limited allegations of his own situation. Specifically, his attorney asserted at trial that UMB had "two doors", i.e., one for non-disabled applicants and one for disabled applicants who were never seriously considered for employment. In fact, the attorney for the EEOC also adopted this line of argument, stating in her opening argument, "[Counsel for Graves] will tell you more about Mr. Graves's travel through UMB's second door, the one reserved for the disabled at UMB." Because Graves and the EEOC cast their arguments in this broad fashion and essentially alleged a systemic problem with disability discrimination, we find little merit to their claim that the district court abused its discretion in allowing evidence of UMB's record of hiring persons with disabilities.

Regarding the exclusion of evidence concerning another person's allegations against UMB, the district court prudently determined the evidence would introduce cumbersome collateral issues. Graves sought to introduce a Charge of Discrimination and Petition for Damages from a woman named Kathryn Pietarila who alleged instances of disability discrimination by UMB in 2003 and 2004. Graves sought to use this evidence to question UMB's Vice President of Employee Relations as to the

-16-

specifics of Pietarila's allegations. The district court correctly excluded the evidence because the evidence consisted of little more than allegations with limited probative value and because it would have required extensive examination of wholly collateral issues regarding not only the specifics of Pietarila's allegations, but also the truth and merits of those allegations.  See Fed. R. Evid. 403.  As the district court noted, "We are not going to try another lawsuit.  We have enough to manage."  In this context we find no abuse of discretion.

The judgment of the district court is affirmed.

_____