# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-3317

_____

|  |  |  |
|---|---|---|
| George Schoedinger; Signature Health Services, Inc., | * * * | |
| Plaintiffs - Appellants, | * * | Appeal from the United States District Court for the |
| v. | * * | Eastern District of Missouri. |
| United Healthcare of the Midwest, Inc., | * * * | |
| Defendant - Appellee. | * | |

_____

Submitted: June 11, 2008
Filed: March 5, 2009

_____

Before LOKEN, Chief Judge, COLLOTON, Circuit Judge, and PIERSOL,[*] District
Judge.

_____

LOKEN, Chief Judge.

Orthopedic surgeon George Schoedinger and his employer, Signature Health
Services, Inc. (collectively, "Plaintiffs"), commenced this action for damages and
equitable relief, alleging that United Healthcare of the Midwest, Inc. ("United"),
wrongfully denied or reduced 295 health care insurance claims. United removed the
action because 289 of those claims were submitted under employee welfare benefit

_____

[*]The HONORABLE LAWRENCE L. PIERSOL, United States District Judge
for the District of South Dakota, sitting by designation.

plans governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. Plaintiffs then filed an amended complaint asserting, as relevant here, state law claims for breach of contract and for violations of the Missouri Prompt Payment Act, Mo. Rev. Stat. § 376.383 ("MPPA"), and federal claims under ERISA and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964(c).

Prior to trial, United paid the unpaid principal amount of most of the claims. The evidence at the bench trial established that United's computerized claims processing system committed hundreds of errors that resulted in improper denial, reduction, or delayed payment of claims for Dr. Schoedinger's health care services. The errors included continuing to apply in-network discounts after Dr. Schoedinger terminated his provider agreement; inappropriate "grouping" or "bundling" of distinct medical procedures; improper "downcoding" (basing payment on a less expensive procedure); and requesting unnecessary information before processing claims. The result, Signature witnesses testified, was that United was consistently $200,000 to $600,000 delinquent in paying claims, and Signature incurred the expense of a claims department to ferret out and correct repeated errors that United refused to correct. After trial, the district court[1] awarded Plaintiffs an additional $28,874.04 in principal on the 289 ERISA claims, $4,768.62 in interest on the six non-ERISA claims, and $284,261.47 in pre-judgment interest, attorneys' fees, and costs. This award is not challenged on appeal. The court also dismissed the RICO claim at the close of Plaintiffs' case, and ruled at the close of all the evidence that United breached no independent contract governing the ERISA claims, that ERISA preempts claims for additional penalties under the MPPA, and that Plaintiffs are not entitled to broad injunctive relief. Plaintiffs appeal these rulings. We affirm.

---

[1]The HONORABLE STEPHEN N. LIMBAUGH, SR., United States District Judge for the Eastern District of Missouri, now retired.

# I. The Breach of Contract Issue

Dr. Schoedinger is one of more than fifty physicians employed by Signature, one of the largest health care provider organizations in the St. Louis metropolitan area. United is a nation-wide health care insurer and claims administrator. Each year, Signature submits thousands of claims to United for treatment provided to patients covered by a health care plan administered by United. Before a patient covered by a United plan is treated by Dr. Schoedinger or another Signature physician, the patient signs an assignment of plan benefits form that Signature later submits to United with its claim for payment.

United's claim submission procedures are described on its website and in an administrative guide distributed to providers. Like most plan administrators, United maintains a network of participating providers who agree by written contract to accept, as full payment for services provided to patients covered by a United plan, an agreed amount that is typically lower than the billed charges. Dr. Schoedinger terminated his "in-network" agreement with United effective April 15, 2003. The claims at issue in this case were for patient treatment after that date, when Dr. Schoedinger was an "out-of-network" provider. Most Signature physicians remained in United's provider network. United's claim procedures appear to be the same for in-network and out-of-network providers.

At trial, United conceded that the patients' assignments of plan benefits provided a contractual basis for the ERISA and non-ERISA claims at issue. But Plaintiffs argued that the claims procedures published by United on its website, in the administrative guide, and in insurance cards distributed to plan participants constituted an offer of an independent contract in which United promised to properly and promptly compensate Dr. Schoedinger every time he treated a United plan member. Finding no Missouri law addressing the issue in this context, the district court logically looked to Missouri cases determining whether an employee handbook

created a contract between employer and employee. See Johnson v. McDonnell Douglas Corp., 745 S.W.2d 661, 662 (Mo. banc 1988). The court found that none of United's documents "contain language which could be interpreted as a manifestation of willingness to enter into a bargain." Thus, there was no offer and no contract.

After careful review of the record, we conclude that the court's findings of no offer and no contract are not clearly erroneous. See Kansas City Power & Light Co. v. Burlington N. R.R., 707 F.2d 1002, 1003 (8th Cir. 1983) (standard of review). At trial, Dr. Schoedinger testified that he had contracts with patients, not with United. United's website explains how to verify a patient's eligibility and submit health care claims, provides tips for faster claims processing, and describes how health care coverage decisions are made. A provider using the website who wishes to review United's reimbursement policy is first brought to a webpage entitled "Reimbursement Policy Agreement" which states that the policy "is intended to serve only as a general reference resource," and that United "may modify this reimbursement policy from time to time." The viewer must click, "I Agree," to then review detailed policies regarding matters such as "Co-Surgeon Services" and "Multiple Procedure Reductions." Though more detailed than the website, we agree with the district court that United's administrative guide is an instruction manual, not a contract offer. The insurance cards United provides to plan beneficiaries expressly state, "This card does not prove membership nor guarantee coverage."

## II. The MPPA Preemption Issue

The Missouri Prompt Payment Act imposes statutory penalties on a health carrier that "fails to pay, deny or suspend" a claim within forty days, and interest of one percent per month if the health carrier "has not paid the claimant on or before the forty-fifth day." Mo. Rev. Stat. §§ 376.383.5-.6. The district court awarded Plaintiffs interest for United's violations of these MPPA provisions in processing the six non-ERISA claims. However, the court denied MPPA relief on the 289 ERISA claims,

-4-

concluding that these MPPA remedies are preempted by ERISA. Plaintiffs appeal that ruling, which we review *de novo*. Painter v. Golden Rule Ins. Co., 121 F.3d 436, 438 (8th Cir. 1997), cert. denied, 523 U.S. 1074 (1998).

ERISA preempts state laws that conflict with its provisions or frustrate its objectives. Boggs v. Boggs, 520 U.S. 833, 841 (1997). The Supreme Court has repeatedly held that "any state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted." Aetna Health Inc. v. Davila, 542 U.S. 200, 208-09, 214-16 (2004); see Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 52-54 (1987). In In re Life Ins. Co. of N. Am., 857 F.2d 1190, 1194-95 (8th Cir. 1988), we held that ERISA preempts claims for penalties under the Missouri Vexatious Refusal to Pay Statute, Mo. Rev. Stat. § 375.420, explaining that "Pilot Life could not have stated with any greater clarity that the remedies afforded under ERISA are exclusive, and no state law purporting to supply additional remedies will escape the preemptive effect of [29 U.S.C.] § 1144(a)." We have consistently applied this principle. See Werdehausen v. Benicorp Ins. Co., 487 F.3d 660, 669 (8th Cir. 2007) ("any state law remedy is preempted by ERISA's comprehensive remedial scheme") (emphasis omitted).

Plaintiffs argue that a state law obligating an ERISA plan administrator to promptly pay health care providers is not preempted because its impact on the plan is "too remote." Plaintiffs rely on the decision in Baylor Univ. Med. Ctr. v. Ark. Blue Cross Blue Shield, 331 F. Supp. 2d 502, 511-12 (N.D. Tex. 2004), that the Texas Prompt Pay Law was not completely preempted by ERISA. We are not persuaded. Unlike the Texas statutes at issue in Baylor, the MPPA regulates health carrier payments to "claimants," who are broadly defined to include ERISA participants and beneficiaries. Mo. Rev. Stat. § 376.383.1(1). Moreover, the state law claim in Baylor was based on a provider agreement, whereas Dr. Schoedinger's ERISA claims are based on patients' assignments of plan benefits. Thus, the impact of the MPPA on

plan administration is not "remote." Indeed, even if a provider asserts a contract right independent of his right under the patient's assignment of plan benefits, the impact of additional state law remedies on ERISA plan administration may require preemption of a state law claim based on that contract. Cf. In Home Health, Inc. v. Prudential Ins. Co. of Am., 101 F.3d 600, 606 (8th Cir. 1996); Ark. Blue Cross & Blue Shield v. St. Mary's Hosp., Inc., 947 F.2d 1341, 1348-49 (8th Cir. 1991). Finally, the Baylor court's analysis of complete preemption seems inconsistent with the Supreme Court's later decision in Davila, which reversed a Fifth Circuit ruling that another claim under Texas law was not preempted.

For these reasons, we affirm the district court's ruling that ERISA preempts Plaintiffs' claims for MPPA remedies. We note that the district court's award of interest for wrongfully delayed ERISA benefit payments in this case was appropriate under 29 U.S.C. § 1132(a)(3)(B). Parke v. First Reliance Standard Life Ins. Co., 368 F.3d 999, 1009 (8th Cir. 2004).

### III. The  RICO Claim

RICO prohibits a person associated with an "enterprise" from conducting the enterprise's affairs "through a pattern of racketeering activity" and provides a private right of action for treble damages to any person "injured in his business or property by reason of a violation." 18 U.S.C. §§ 1962(c), 1964(c). "Racketeering activity" is defined in § 1961(1)(B) to include "any act which is indictable" under the federal statute prohibiting mail fraud. A person is guilty of criminal mail fraud if he devises a "scheme or artifice to defraud" and uses the mails "for the purpose of executing such scheme or artifice." 18 U.S.C. § 1341.

An understanding of Plaintiffs' RICO claim requires additional background facts. The vast majority of the claims at issue (268 of 295) involved patients of Dr. Schoedinger who were railroad employees or dependents covered under ERISA health

-6-

plans self-funded by the railroad employers. United processed these claims under separate contracts with the plans. The self-funded plans were liable for the benefits United paid, and United's compensation did not vary depending upon whether a claim for provider services was paid in full, reduced, or denied. When United processed a claim submitted by a provider that United considered an in-network provider -- whether correctly or incorrectly -- United as plan administrator acted unilaterally in determining applicable discounts and other coverage issues. However, when United processed a claim for services by an out-of-network provider, United's contracts with the railroad health care plans required that it submit the claim to Coalition America, Inc. ("Coalition").

Coalition was a competitor of United that contracted with the plans to "rent" additional provider networks and make those networks available to the plans, allowing the plans to receive discounted rates for services by providers not in United's network. It is undisputed that United's contracts with the plans required United to pay benefit claims based on "re-pricing" information it received from Coalition, that the plans paid Coalition a fee based on the savings obtained, and that Coalition otherwise played no role in United's actions as claims administrator.

After processing a health care claim, United sent Signature a computer-generated explanation of benefit form ("EOB") along with any approved payment. United's errors in processing the 295 claims at issue were reflected in its initial EOBs to Signature. United's EOBs advised when United applied an out-of-network discount based on information received from Coalition, identified the "rented" provider network under which the discount was applied, and advised Signature to contact Coalition to challenge the discount, a process fraught with delays and unsatisfactory responses according to Signature's trial witnesses. Plaintiffs' RICO claim is premised on the assertions that United "engaged in a scheme to avoid paying full amounts of claims," that United's claims processing errors were intentional, and therefore that the erroneous EOBs constituted repeated acts of indictable mail fraud.

At the close of Plaintiffs' evidence, the district court granted United's motion for partial judgment dismissing this RICO claim. The district court ruled orally that United's motion for judgment was granted because Plaintiffs failed to provide "sufficient factual evidence to support the RICO claim." In a Memorandum and Order filed some days after trial, the court adopted United's argument that Plaintiffs lacked standing to assert a RICO claim under Appletree Square I, LP v. W.R. Grace & Co., 29 F.3d 1283, 1286 (8th Cir. 1994), where we stated: "In order to establish injury to business or property 'by reason of' a predicate act of mail or wire fraud, a plaintiff must establish detrimental reliance on the alleged fraudulent acts." While the case was pending on appeal, the Supreme Court resolved a conflict in the circuits on this issue, holding that "a plaintiff asserting a RICO claim predicated on mail fraud need not show, either as an element of its claim or as a prerequisite to establishing proximate causation, that it relied on the defendant's alleged misrepresentations." Bridge v. Phoenix Bond & Indem. Co., 128 S. Ct. 2131, 2145 (2008). Therefore, Plaintiffs argue, the dismissal of this claim must be reversed.

Plaintiffs argue that we review the RICO claim dismissal under the standard applicable to the grant of judgment as a matter of law, resolving all fact conflicts in their favor and giving them the benefit of all reasonable inferences. This is incorrect. The district court granted judgment on partial findings at the close of the Plaintiffs' case in a bench trial, a procedure expressly authorized by Rule 52(c) of the Federal Rules of Civil Procedure. "[A]n appellate court that reviews a judgment made on partial findings may not set aside the findings of fact unless they are clearly erroneous, i.e., a review of the evidence leaves the court with a firm belief that a mistake has been made." 9 Moore's Federal Practice § 52.52[1] (2008). When Rule 52(c) was amended in 2007 to delete a prior reference to judgment as a matter of law, the Advisory Committee notes explained: "The standards that govern judgment as a matter of law in a jury case have no bearing on a decision under Rule 52(c)."

Plaintiffs further argue on appeal that *they* are entitled to judgment on their RICO claim and a new trial on damages. But that would not be the appropriate remedy given our substantial doubt whether Plaintiffs' proof at trial established other elements of a RICO damage action the district court did not address. First, it is undisputed that United as plan administrator acted unilaterally in determining discounts such as grouping and downcoding and in incorrectly treating Dr. Schoedinger as an in-network provider after April 15, 2003. Thus, as to these claims, Plaintiffs apparently failed to prove what every circuit has required to establish a RICO damage claim under 18 U.S.C. § 1962(c) -- that United, the RICO defendant, was distinct from the alleged enterprise whose affairs were allegedly conducted through a pattern of racketeering activity. See Fogie v. Thorn Americas, Inc., 190 F.3d 889, 896-97 (8th Cir. 1999), and cases cited; United States v. Goldin Ind., Inc., 219 F.3d 1268, 1271 (11th Cir. 2000) (en banc).

Second, the participation of the plans and Coalition in the processing of claims where Dr. Schoedinger was treated as an out-of-network provider raises the possibility of an "association-in-fact" enterprise distinct from United. But the plans, who established independent contractual relations with United and Coalition and reaped the financial benefit of any cost savings, are not accused of misconduct. Nor was there evidence United and Coalition acted in unison. These facts suggest a finding that Plaintiffs failed to prove that United had "some part in directing [the enterprise's] affair." Dahlgren v. First Nat'l Bank of Holdrege, 533 F.3d 681, 689 (8th Cir. 2008), cert. denied, 2009 WL 160646 (U.S. Jan. 26, 2009), quoting Reves v. Ernst & Young, 507 U.S. 170, 179 (1993).

We do not decide those issues because they were not the subject of the findings of fact and conclusions of law that Rule 52(c) requires. Returning to the issue the district court did decide, the court's conclusion that lack of detrimental reliance was, by itself, fatal to Plaintiffs' RICO claim was overruled by the subsequent decision in Bridge. But that conclusion was supported by findings that are not clearly erroneous:

-9-

In calculating payments made to Dr. Schoedinger, [United] incorrectly took discounts, and improperly reduced the amount owed to the doctor through "down coding" and "bundling." *[United's] actions, although improper, were clearly explained on the EOB's.*

(Emphasis added.) While a plaintiff's detrimental reliance is not an element of a RICO claim predicated on mail fraud, "materiality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes." Neder v. United States, 527 U.S. 1, 25 (1999); see United States v. Goodman, 984 F.2d 235, 237 (8th Cir. 1993) (a scheme to defraud must be "reasonably calculated to deceive persons of ordinary prudence and comprehension"). In this case, the only allegedly material falsehoods claimed by Plaintiffs were the incorrect EOBs. But as the district court found, the EOBs were what they purported to be -- truthful disclosures of discounts applied in determining what covered benefits United was paying. Plaintiffs concede that the EOBs clearly explained United's justifications for the underpayments.

It is not a scheme to defraud to adopt as a claims policy, "When in doubt, apply the discount and truthfully disclose it." It might be fraud to intentionally (or with reckless disregard) apply and disclose deductions known to be improper when the claims payer knows that a substantial number of claimants would not challenge the deductions. But Plaintiffs' proof at trial (to the extent made part of the record on appeal) included no evidence of such intentional deceit, only repeated, unexplained errors. And there is no proper basis to assume such intentional fraud, which if uncovered would destroy United's credibility as an ERISA plan fiduciary. Nor did Plaintiffs present evidence that the railroad health plans devised a scheme to intentionally underpay providers and enlisted United to implement that scheme with inaccurate EOBs. For these reasons, although the district court's legal conclusion regarding reliance was undercut by Bridge, we affirm the dismissal of the RICO claim because the trial record and the court's findings "sufficiently inform[ this] court of the basis for the trial court's decision." Scoggins v. Board of Educ., 853 F.2d 1472, 1477 (8th Cir. 1988) (quotation omitted).

-10-

## IV. Injunctive Relief

Finally, Plaintiffs contend that the district court erred in declining to enter a proposed twenty-one-paragraph injunction detailing the manner in which United must process future claims. Plaintiffs contend they are entitled to injunctive relief under state law, without disclosing whether the injunction they seek would be limited to non-ERISA claims and, if not, why ERISA would not preempt such relief. Treating this as an issue of state law, the district court denied the requested injunction because (i) the court "is not in the insurance business, and will not impose such exacting restrictions upon a corporate entity," and (ii) Plaintiffs have an adequate remedy "provided through ERISA and state law." Reviewing this decision for abuse of discretion under both ERISA and state law, we affirm. See Hinz v. Neuroscience, Inc., 538 F.3d 979, 986 (8th Cir. 2008), and State ex rel. Ellis v. Creech, 259 S.W.2d 372, 374 (Mo. banc 1953) (standard of review). As the district court noted, ERISA allows for the recovery of costs and attorneys fees in addition to unpaid plan benefits.

The judgment of the district court is affirmed.

_____