# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-2473

_____

Kerry McLain,                                   *
                                                *
            Appellant,                          *
                                                *   Appeal from the United States
      v.                                        *   District Court for the
                                                *   District of Minnesota.
Andersen Corporation, a                         *
Minnesota Corporation;                          *
Andersen Distribution, Inc.,                    *
a Delaware Corporation,                         *
                                                *
            Appellees.                          *

_____

Submitted: March 12, 2009
     Filed: June 3, 2009

_____

Before MURPHY, MELLOY, and SHEPHERD, Circuit Judges.

_____

MELLOY, Circuit Judge.

Kerry McLain appeals the district court's[1] adverse grant of summary judgment dismissing his state-law claims against Andersen Corporation and Andersen Distribution, Inc. (collectively, "Andersen"). McLain argues that federal subject-

_____

[1] The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

matter jurisdiction is absent in this removal action and, alternatively, that summary judgment was inappropriate. We affirm.

I.

A. Factual Background

McLain is a Minnesota citizen. Andersen Corporation is a Minnesota corporation. Andersen Distribution, Inc., is a Delaware corporation.

In 1999, McLain began working for Andersen as a truck driver. Truck drivers at Andersen deliver Andersen products to retail stores, lumberyards, and job sites, which are typically new construction sites for commercial and residential properties. They also make "run-off" deliveries, which are unscheduled, smaller deliveries to retail stores or lumberyards. The truck drivers are responsible for unloading their delivered products.

McLain held a "Class B" driver's license while working at Andersen. The license limited him to driving trucks twenty-six feet long or shorter. From 1999 until approximately April 2006, McLain primarily delivered products to Home Depot stores, but he also occasionally delivered to lumberyards and job sites.

In early 2006, Andersen decided to use its "Class A" trucks, i.e., trucks over twenty-six feet long, to make its regular deliveries to Home Depot stores. This change was part of a nationwide initiative by Andersen, in conjunction with Home Depot, to reduce delivery costs and meet Home Depot's larger delivery demands. Pursuant to this change, McLain's supervisor, John Mathias, informed McLain that his role would be changing and that his primary job as a Class B truck driver would be delivering to job sites and making occasional run-off deliveries when needed. Mathias asked McLain if he would be interested in driving one of the Class A trucks during a night

shift instead, which would have required McLain to obtain a Class A license. McLain declined and voiced disagreement with the policy change. He alleges that Mathias swore at him and told him that he could quit if he did not like the change.

Rather than quit, McLain began delivering primarily to job sites. Job-site deliveries typically require truck drivers to unload products on uneven terrain or inclined surfaces. McLain had suffered a knee injury in 1985 that resulted in a three-percent permanent disability in his right knee. No one at Andersen was aware of this injury, and it had not previously affected McLain's ability to work at Andersen. McLain began to suffer pain in his right knee, however, after he began delivering primarily to job sites.

On May 4, 2006, Dr. William D. Fox examined McLain's knee. Dr. Fox restricted McLain from working, lifting, or squatting until an orthopedic doctor examined him. McLain faxed Dr. Fox's report to Brenda Sandwick, a human-resources director at Andersen. He also hand-delivered a copy of the report to Tom Rustad, a plant supervisor. Andersen temporarily stopped McLain from working because he was unable perform his job safely. On May 10, 2006, Dr. Philip Haley, an orthopedic doctor, examined McLain. Dr. Haley concluded that McLain was temporarily disabled from any occupation and restricted McLain from work until May 22, 2006. Dr. Haley stated, however, that McLain would be "able to work without restrictions" after that date. Andersen, therefore, kept McLain on paid leave until May 22 for safety reasons.

When McLain returned to work on May 22, he orally requested that Mathias not assign him job-site deliveries. Mathias, however, continued assigning McLain job-site deliveries, which McLain performed. McLain continued to have knee pain.

On May 25, 2006, Dr. Haley examined McLain again. Dr. Haley restricted McLain from repetitive walking and lifting and from carrying anything over ten-to-

twenty pounds for four weeks. McLain faxed Dr. Haley's report to Sandwick, and Andersen placed McLain on leave. Dr. Haley subsequently sent a letter to Andersen stating that McLain would be unable to work until July 10, 2006. Dr. Haley did not indicate that restrictions would be necessary upon McLain's return.

McLain returned to work on July 10 and again orally requested that Mathias not assign him job-site deliveries. Mathias, however, continued assigning McLain job-site deliveries, which McLain again performed. McLain continued to have knee pain.

On August 3, 2006, McLain met with Steve French, the plant manager, and stated his belief that assigning him job-site deliveries was a mistake. McLain requested that Andersen not assign him job-site deliveries, and he further criticized how French and others were managing the facility. He told French that Mathias had used profanity toward him and that certain employees were violating company policies by punching a time clock for other employees.

On August 4, 2006, McLain met with French again. As support for his previous-day's claim that "job-site deliveries aggravated [his] knee injury," McLain gave French a 1987 medical report stating that an unnamed patient had a three-percent "impairment to the body as a whole." The report, however, contained no information identifying a patient or describing a specific injury, and McLain had not previously revealed this information while working at Andersen. French, therefore, called the report "unacceptable." French also told McLain that he had addressed the time-clock issue, but French did not specify as to what he had done. After this exchange, McLain continued performing job-site deliveries.

On August 10, 2006, Dr. Haley examined McLain's knee again. Dr. Haley submitted an internally inconsistent report in which he stated that McLain was permanently disabled from any occupation but that McLain could work with the permanent restriction that he not perform job-site deliveries. After receiving Dr.

Haley's August 10 report, French spoke with Deborah Hauble and James Olson, both of whom worked in Andersen's human-resources department. Based on Dr. Haley's report, they were unsure as to whether McLain could continue to perform his job safely.

Andersen assigned McLain to perform run-off deliveries on August 11, 14, and 15. After McLain returned from making a run-off delivery on August 15, French, Sandwick, and Rustad met with McLain to discuss his injury. French asked to see the 1987 doctor's report again. McLain retrieved the report, and French told McLain not to come to work until Andersen clarified his work restrictions.

On August 15, Hauble sent an "urgent" request to Dr. Haley seeking clarification of McLain's work restrictions. Dr. Haley submitted a "Report of Work Ability" that stated that McLain could drive but could not deliver to new-home sites due to ramps and uneven surfaces. The report stated that, in an eight-hour day, McLain could rarely squat or climb (1-5%), could only occasionally stand or walk (6-33%), and could continuously drive (>66%). Hauble sent Dr. Haley follow-up questions to clarify his statement regarding McLain's inability to deliver to new-home sites. Dr. Haley replied that McLain could not deliver to new-home sites, as opposed to Home Depot stores or lumberyards, because McLain could not tolerate ramp angles. He also stated that McLain could not use a truck ramp during a delivery unless it was "horizontal or nearly so" and that McLain's restrictions from working on uneven surfaces included "uneven loading docks, uneven walkways, uneven stairs, etc."

After receiving Dr. Haley's reports, Andersen concluded that McLain's work restrictions precluded him from performing the essential functions of his job. Andersen placed McLain on leave, and McLain began receiving short-term disability pay from Andersen. Hauble sent McLain an application for long-term disability benefits, stated that she would explore alternative work opportunities for McLain on

an ongoing basis, and instructed McLain to contact Mathias regarding other potential deliveries. Matthias, however, told McLain that he had no work available for him.

McLain sent multiple letters to Andersen in August 2006 after Andersen concluded that he could not perform the essential functions of his job. He wrote a letter to Hauble stating that his injury did not preclude him from performing the jobs he had performed before Andersen changed its delivery policies, and he requested that Andersen employ him by assigning him the deliveries he had performed in the past. He also wrote a letter to Olson alleging that Andersen had discriminated against him "on the basis of age, gender, disability, and the failure . . . to accommodate his request to work as a truck driver without being assigned job-site deliveries." He stated that Mathias, French, and others at Andersen had jeopardized his health by assigning him job-site deliveries. He also alleged that Andersen had discriminated against him for requesting an accommodation and complaining about company policy. Hauble responded in a letter that McLain was unable to perform the essential functions of his job and that Andersen did not currently have openings that met Dr. Haley's restrictions. She advised McLain that she would contact him when she found possible job openings.

On September 5, 2006, Dr. Fox examined McLain again. Dr. Fox concluded that "variable grade/variable surface and job sites" caused McLain pain but that McLain had "tolerated more consistent sites[,] i.e.[,] Home Depot, Dealers, Dock Sites." On September 7, 2006, Dr. Haley also reexamined McLain. Haley wrote to Hauble and stated that McLain could "tolerate[] the use of unloading docks at places like Home Depot, lumberyards and the like" but that problems would arise with "job sites where loading and unloading areas are improvised, irregular in contour, and the like."

After receiving the latest medical reports on McLain's injury, Hauble and Olson both informed McLain again that his work restrictions would not allow him to perform

the essential functions of his job. They also stated that Andersen did not currently have alternative openings within McLain's restrictions, so McLain remained on leave and continued collecting short-term disability benefits. McLain asked Hauble what specific jobs he might be able to perform. Hauble replied that she believed McLain would be able to perform jobs with Andersen Logistics or in the Renewal Center. Hauble told McLain that she would contact him when job openings in those areas occurred. On September 15, 2006, Olson notified McLain of a potential delivery route to Iowa that he believed would work with McLain's permanent restrictions. The route, however, required a Class A license, and Olson advised McLain that he would need to upgrade his current license to qualify for the position.

On September 28, 2006, both Dr. Fox and Dr. Haley examined McLain again. Dr. Fox concluded that McLain could perform the duties he had performed prior to May 2006 but that McLain would have problems with job-site deliveries and uneven ramps. Dr. Haley similarly concluded that McLain could return to work with the restrictions that McLain could not perform job-site deliveries, could occasionally squat or climb (34–64%), and could frequently stand and walk (34-66%). McLain mailed and faxed Dr. Fox's and Dr. Haley's reports to Andersen.

On September 29, 2006, McLain contacted Mathias and inquired about on-the-job training for a Class A license. Mathias stated that he would speak to French about whether such training was available. Mathias later notified McLain that, under Andersen policy, he would have to attend a training school before he could qualify to drive a Class A truck. He referred McLain to Olson for more specific details.

On October 10, 2006, Olson contacted McLain and stated in a voicemail that he wanted to meet with McLain "to see what can be done about a job." When McLain and Olson spoke, however, McLain notified Olson that he had filed this lawsuit. Olson therefore did not schedule a meeting because he first wanted to speak with an attorney.

On October 19, 2006, McLain wrote a letter to Olson inquiring about on-the-job training for a Class A license. On November 6, 2006, Olson wrote to McLain and stated that Andersen's policies would require him to successfully complete a training program at a local school. Olson stated that it was likely Andersen would reimburse the cost of the class but that he could not guarantee McLain a job upon attaining a Class A license. Olson stated that hiring would depend on available work and McLain's specific job restrictions.

McLain had two options at a local school to train for his Class A license: an eight-week day class and a sixteen-week night class. Both classes required attendance, and the night class began at 5:00 p.m. Because Andersen had placed McLain on call for potential deliveries and McLain would have to leave work at 4:00 p.m. to attend the night class, McLain asked for paid leave to take the day class. Andersen denied McLain's request because, while it had tuition-assistance programs, it had no programs offering paid leave for employees to attend such classes. McLain then asked if Andersen would permit him to be unavailable for work while he attended the day class. Andersen stated that it would permit McLain to apply for an unpaid, eight-week leave of absence. McLain stated that he could not take an unpaid leave of absence and that, regardless, it was too late to sign up for a class. Thus, McLain did not train to get his Class A license.

In January 2007, Andersen's insurance carrier denied McLain's application for long-term disability benefits. In February 2007, Olson informed McLain that Andersen policy permitted him to continue on leave for up to two months after exhausting his short-term disability pay. At that time, however, Andersen reserved the right to terminate McLain if it could not find him work.

McLain's short-term disability pay ended in February 2007. At McLain's request, Andersen kept McLain on leave for two months, but Andersen ultimately was

unable to find McLain work. Thus, in April 2007, Andersen terminated McLain's employment. Further relevant facts related to McLain's claims are discussed below.

### B.    Procedural History

In October 2006, McLain sued Andersen in state court alleging multiple state-law violations of the Minnesota Human Rights Act (the "MHRA"), Minn. Stat. §§ 363A.01–363A.41, including a claim that Andersen interfered with his pension. Andersen removed the case to federal court, arguing that the Employee Retirement Income Securities Act ("ERISA"), 29 U.S.C. §§ 1001–1461, completely preempted McLain's pension-related claim and created federal-question jurisdiction.

In May 2007, McLain filed an amended complaint in federal court that omitted his pension-related claim. He then moved to remand the matter to state court. The district court denied McLain's motion to remand, exercised supplemental jurisdiction over the remaining state-law claims, and granted summary judgment in Andersen's favor. McLain filed a timely notice of appeal.

## II.

### A.    Subject-Matter Jurisdiction

On appeal, McLain argues first that the district court did not have subject-matter jurisdiction to resolve this dispute. He argues that he only alleged state-law violations and that his suit was not removable because it did not raise a federal question. Andersen contends that the district court correctly concluded that McLain's original complaint alleged a pension-related claim that ERISA completely preempted, thus creating a federal question at the time of removal. "We review de novo a district court's exercise of removal jurisdiction and its denial of a motion to remand." Pet Quarters, Inc. v. Depository Trust and Clearing Corp., 559 F.3d 772, 778 (8th Cir.

2009). "We review a district court's decision regarding ERISA preemption de novo." Parkman v. Prudential Ins. Co. of Am., 439 F.3d 767, 771 (8th Cir. 2006) (per curiam).

"[F]ederal question jurisdiction extends only to 'civil actions arising under the Constitution, laws, or treaties of the United States.'" Mamot Feed Lot and Trucking v. Hobson, 539 F.3d 898, 902 (8th Cir. 2008) (quoting 28 U.S.C. § 1331). "Removal based on federal question jurisdiction is governed by the well pleaded complaint rule: jurisdiction is established only if a federal question is presented on the face of the plaintiff's properly pleaded complaint." Pet Quarters, 559 F.3d at 779. As the Supreme Court has recognized, however,

> There is an exception . . . to the well-pleaded complaint rule. When a federal statute wholly displaces the state-law cause of action through complete pre-emption, the state claim can be removed. This is so because when the federal statute completely pre-empts the state-law cause of action, a claim which comes within the scope of that cause of action, even if pleaded in terms of state law, is in reality based on federal law. ERISA is one of these statutes.

Aetna Health Inc. v. Davila, 542 U.S. 200, 207–08 (2004) (internal citations, quotations, and alterations omitted); see also Caterpillar, Inc. v. Williams, 482 U.S. 386, 393 (1987) ("Once an area of state law has been completely pre-empted, any claim purportedly based on that pre-empted state law is considered, from its inception, a federal claim, and therefore arises under federal law.").

Andersen's pension plan is undisputedly an ERISA-governed plan and Count II of McLain's original complaint alleged "DISCRIMINATION FOR INTERFERENCE WITH AGE AND PENSION BENEFITS UNDER THE [MHRA]." More specifically, McLain alleged that Andersen violated Minnesota Statute § 363A.08, subdivision 7, which states:

-10-

**Interference with age and pension rights.** For purposes of this section, discrimination on account of age shall include acts which interfere with an employee's opportunity to acquire pension credits or pension benefits when the interference cannot be shown to have been based on just cause unrelated to the employee's status with regard to pension credits or pension benefits.

Minn. Stat. § 363A.08, subdiv. 7.

In analyzing a complete-preemption claim under ERISA, we have recognized that "[t]he Supreme Court has repeatedly held that 'any state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted.'" Schoedinger v. United Healthcare of Midwest, Inc., 557 F.3d 872, 875–76 (8th Cir. 2009) (quoting Davila, 542 U.S. at 208–09 and citing Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 52–54 (1987)). We have also stated that "a state-law cause of action is preempted if it arises from a duty created by ERISA" or "'provides a separate vehicle to assert a claim for benefits outside of, or in addition to, ERISA's remedial scheme.'" Prudential Ins. Co. of Am. v. Nat. Park Med. Ctr., Inc., 413 F.3d 897, 914 (8th Cir. 2005) (quoting Davila, 542 U.S. 217–18).

ERISA § 510 specifically prohibits persons from discriminating against plan participants "for the purpose of interfering with the attainment of any right to which such participant may become entitled," 29 U.S.C. § 1140, and ERISA's civil-enforcement provision, § 502(a), is the "the exclusive remedy for rights guaranteed under ERISA, including those provided by § 510." Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 144 (1990) (citing Pilot Life, 481 U.S. at 54); see also 29 U.S.C. § 1132(a)(3).

Applying the above-described precedent, we therefore agree with Andersen that ERISA completely preempted McLain's pension-related claim because ERISA

explicitly protects against, and provides an exclusive remedy for, the discrimination alleged in McLain's complaint.  See, e.g., Prudential Ins. Co., 413 F.3d at 913–14 (finding federal-question jurisdiction under the complete-preemption doctrine where the plaintiffs could have brought their state-law claims under ERISA); Register v. Honeywell Fed. Mfg. & Tech., LLC, 397 F.3d 1130, 1137–38 (8th Cir. 2005) (resolving a § 510 claim where plaintiffs alleged that their employer terminated them based on their ages to interfere with their pension benefits).

The Supreme Court, in Ingersoll-Rand, faced a similar question, and its analysis controls our resolution of this issue.  In that case, the Court examined whether ERISA "pre-empt[ed] a state common law claim that an employee was unlawfully discharged to prevent his attainment of benefits under a plan covered by ERISA."  Ingersoll-Rand, 498 U.S. at 135.  The Court concluded that ERISA completely preempted the state-law claim because the state cause of action "conflict[ed] directly with an ERISA cause of action."  Id. at 142.  More specifically, the Court determined that the state cause of action fell "squarely within the ambit of ERISA § 510" and that § 502(a) provided the employee the "exclusive remedy" for his claim.  Id. at 142, 144.  Accordingly, the Court held "that when it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 510 of ERISA, due regard for the federal enactment requires that state jurisdiction must yield."  Id. at 145 (quotations and alterations omitted).

The case before us is similar to Ingersoll-Rand.  McLain's original complaint raised a claim that "falls squarely within the ambit of ERISA § 510," id. at 142, because the state statute on which he relies "purports to provide a remedy for the violation of a right expressly guaranteed by § 510 and exclusively enforced by § 502(a)."  Id. at 145.  Thus, although McLain's original complaint "purport[ed] to raise only state law claims, [it was] necessarily federal in character" and removal was proper.  Metro. Life Ins. Co. v. Taylor, 481 U.S. 58, 67 (1987); see id. at 66

("Congress has clearly manifested an intent to make causes of action within the scope of the civil enforcement provisions of § 502(a) removable to federal court.").

McLain, however, attempts to defeat this conclusion with three arguments. First, McLain argues that there was no federal question on the face of his amended complaint—i.e., the complaint in which he omitted his pension-related claim—and that the district court therefore did not have subject matter jurisdiction. This claim is meritless. "[J]urisdiction is determined at the time of removal, even though subsequent events may remove from the case the facts on which jurisdiction was predicated." Quinn v. Ocwen Fed. Bank FSB, 470 F.3d 1240, 1248 (8th Cir. 2006); see also Grupo Dataflux v. Atlas Global Group, L.P., 541 U.S. 567, 570 (2004) ("It has long been the case that 'the jurisdiction of the court depends upon the state of things at the time of the action brought.'" (quoting Mollan v. Torrance, 22 U.S. 537, 539 (1824))). Moreover, pursuant to 28 U.S.C. § 1367, courts have the discretion to exercise supplemental jurisdiction over remaining state-law claims even after "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).

Second, McLain argues that complete preemption is not present because his pension losses were only a "consequence of the alleged discriminatory conduct," that "ERISA is not intended to preempt state law where there is an incidental loss of benefits as a result of discrimination," and "that ERISA does not preempt state law claims . . . where the benefits claimed are merely one part of the remedy." McLain's original complaint, however, expressly asserted that Andersen, due to McLain's age, interfered with McLain's opportunity to acquire pension benefits in violation of the MHRA. That allegation supported its own cause of action, and McLain specifically alleged facts on the record to support that claim. We therefore reject as contrary to the record McLain's argument that he merely sought to recover lost benefits as incidental damages to other alleged unlawful conduct.

-13-

Finally, citing a Minnesota district-court decision, <u>Alwin v. Sprint Communications, Co.</u>, 870 F. Supp. 275 (D. Minn. 1994), McLain argues that complete preemption is not present because he did not specifically allege "that the motivating factor behind [his] termination was [Andersen's] attempt to avoid benefit payments." <u>Alwin</u>, 870 F. Supp. at 277. While we agree with <u>Alwin</u>'s finding that ERISA § 510 completely preempts the MHRA in cases where such an allegation is made, we reject McLain's argument that preemption is limited to those circumstances. Instead, § 510 explicitly regulates a broader swath of employer activity, stating that "[i]t shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this subchapter, or the Welfare and Pension Plans Disclosure Act." 29 U.S.C. § 1140. As just stated, McLain's original complaint asserted that Andersen discriminated against him based on his age to interfere with his pension benefits. As such, his claim falls within § 510's coverage. For these reasons, we hold that the district court correctly concluded that original jurisdiction was present when Andersen removed this case to federal court.[2]

B.      Summary Judgment

McLain alternatively argues that the district court erred in granting summary judgment against his state-law-based disability-discrimination, reprisal, and

---

[2] Beyond arguing on appeal that the district court did not have jurisdiction at the time of removal, McLain raises no other arguments to contest the district court's exercise of supplemental jurisdiction in resolving his remaining state-law claims. Nonetheless, we note that a "district court holds broad discretion under 28 U.S.C. § 1367(c)(3) to dismiss related state law claims after federal claims are dismissed." <u>Stewart v. Indep. Sch. Dist. No. 196</u>, 481 F.3d 1034, 1046 (8th Cir. 2007), and the record adequately supports Andersen's contention that the district court did not abuse its discretion in exercising supplemental jurisdiction over the remaining state-law claims after the pension-related claim was dismissed.

misrepresentation claims. We review the district court's grant of summary judgment de novo, viewing the evidence "in the light most favorable to the non-moving party." Peyton v. Fred's Stores of Ark., Inc., 561 F.3d 900, 901 (8th Cir. 2009) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 330 n.2 (1986)). We "affirm[] only when no genuine issue of material fact remains and the moving party is entitled to judgment as a matter of law." Id. (citing Celotex Corp., 477 U.S. at 322–23 and Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249–50 (1986)).

### 1. Disability Discrimination

McLain argues that the district court erred in granting summary judgment against his state-law-based disability-discrimination claim because the court failed to apply state law in reaching its conclusion. The MHRA prohibits disability discrimination, see Minnesota Statute § 363A.08, subdivision 2, and a person alleging disability discrimination in violation of the MHRA may prove his or her case "by direct evidence or by using circumstantial evidence in accordance with the three-part burden-shifting test set out by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)." Hoover v. Norwest Private Mortgage Banking, 632 N.W.2d 534, 542 (Minn. 2001). The parties agreed before the district court that McLain does not present direct evidence of disability discrimination, and McLain makes no assertion on appeal that he presents such evidence. Thus, we analyze McLain's claim under McDonnell Douglas. See id.

Applying McDonnell Douglas, a plaintiff attempting to prove disability discrimination under the MHRA "must first make out a prima facie case of discrimination." Id. To do so, the plaintiff must show "that he was (1) disabled within the meaning of the MHRA, (2) qualified to perform the essential functions of the job with or without reasonable accommodation, and (3) suffered an adverse employment action because of his disability." Kammueller v. Loomis, Fargo & Co., 383 F.3d 779, 784 (8th Cir. 2004); see also Dovenmuehler v. St. Cloud Hosp., 509

-15-

F.3d 435, 439 (8th Cir. 2007); Leitner v. Gartner Studios, Inc., No. A07-63, 2008 WL 314177, at *2–3 (Minn. Ct. App. Feb. 5, 2008) (unpublished).  "If the plaintiff makes out a prima facie case, the burden of production shifts to the defendant who . . . must produce admissible evidence sufficient to allow a reasonable trier of fact to conclude that there was a legitimate, nondiscriminatory reason [for its action]."  Hoover, 632 N.W.2d at 542.  If the defendant makes that showing, "the plaintiff has the burden of establishing that the employer's proffered reason is a pretext for discrimination."  Id.

The district court rejected McLain's disability discrimination claim because it found that, even viewing the evidence in McLain's favor, McLain was not disabled as the MHRA defines that term.  The MHRA defines a "disabled person" as "any person who (1) has a physical, sensory, or mental impairment which materially limits one or more major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment."[3]  Minn. Stat. § 363A.03, subdiv. 12.  "The MHRA does not define 'major life activities.'"  Gee v. Minn. State Colls. and Univs., 700 N.W.2d 548, 553 (Minn. Ct. App. 2005).  Thus, "Minnesota has sought guidance in the interpretations of federal antidiscrimination statutes."  Id. (citing Anderson v. Hunter, Keith, Marshall & Co., 417 N.W.2d 619, 623 (Minn. 1988) and Sigurdson v. Isanti County, 386 N.W.2d 715, 719 (Minn. 1986)).

_____

[3] As we have previously recognized, "Under the [Americans with Disabilities Act], disability means 'a physical or mental impairment that *substantially* limits one or more of [an individual's] major life activities.'"  Liljedahl v. Ryder Student Transp. Servs., Inc., 341 F.3d 836, 841 n.3 (8th Cir. 2003) (quoting 42 U.S.C. § 12102(2)) (emphasis added).  The MHRA is "'less stringent,'" requiring that an impairment only "*materially* limit a major life activity."  Id. (quoting Hoover, 632 N.W.2d at 543 nn. 5–6) (emphasis added).

McLain's sole claim on appeal is that he is disabled under the MHRA because Andersen regarded him as such.[4] McLain, however, does not identify any major life activity that Andersen regarded him as materially limited from performing. He did argue before the district court, however, that Andersen regarded him as having an impairment that materially limited him from working. See id. (using federal law to define "major life activities" and recognizing that major life activities under federal regulations explicitly include "'caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.'" (quoting 29 C.F.R. § 1630.2(I) (2003))); see also 29 C.F.R. § 1630.2(i) (2009) ("Major Life Activities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.").

Under Minnesota law, to prove that Andersen regarded McLain as materially limited from working, McLain must show that Andersen "believed [he] could not perform a broad range of jobs," see Leitner, 2008 WL 314177, at *4 (citing Pittari v. Am. Eagle Airlines, Inc., 468 F.3d 1056, 1061–62 (8th Cir. 2006)), that Andersen "regard[ed] the impairment to be permanent or long term," Hanson v. Friends of Minn. Sinfonia, No. A03-1061, 2004 WL 1244229, at *5 (Minn. Ct. App. June 8, 2004) (unpublished) (citing Fuqua v. Unisys Corp., 716 F. Supp. 1201, 1207 (D. Minn. 1989)), and that Andersen perceived McLain's injury as limiting even though McLain was capable of performing work. Rohland v. St. Cloud Christian Sch., No. A04-821, 2004 WL 2940889, at *9 (Minn. Ct. App. Dec. 21, 2004) (unpublished) (citing State by Cooper v. Hennepin County, 441 N.W.2d 106, 112 (Minn. 1989)); We agree with the district court that McLain cannot make this showing.

Putting aside the fact that McLain argues in a later portion of his brief that Andersen did in fact believe he could work, the record does not support McLain's

---

[4] McLain conceded before the district court that he has no impairment limiting a major life activity, and he makes no argument on appeal that he is actually disabled or has a record of such an impairment.

argument here that Andersen regarded him as having an impairment that materially limited him from working.

According to the record, from the time that McLain first needed time off for his knee injury in May 2006 until the time he stopped working in August 2006, Andersen regarded McLain as capable of doing his job. Indeed, until August 2006, Andersen continually assigned McLain deliveries as a Class B truck driver whenever McLain was available, and McLain performed his assignments.

Additionally, while the record shows that Andersen did eventually view McLain as incapable of being a Class B truck driver, that fact alone does not suffice to establish McLain's claim because the record does not show that Andersen regarded McLain as incapable of performing a broad range of other jobs. To the contrary, Andersen did not and does not contest that McLain is able to perform run-off deliveries and deliveries to Home Depots and lumberyards, and it is undisputed that Andersen assigned McLain run-off deliveries even after it received Dr. Haley's report on August 10 indicating that McLain was permanently disabled. Moreover, it is also undisputed that, even after determining that McLain could not perform his job as Class B truck driver, Olson notified McLain of a Class A driving job that he thought McLain could perform, Olson indicated that Andersen might hire McLain as a Class A truck driver if he pursued certification, and Andersen placed McLain on call to make potential deliveries.

Finally, it is undisputed that Hauble believed that McLain could work in at least two different areas of the company, Andersen Logistics and the Renewal Center, and McLain can cite no job that Andersen filled that he believes he was qualified to perform. See McPherson v. O'Reilly Auto., Inc., 491 F.3d 726, 731 (8th Cir. 2007) (affirming an adverse grant of summary judgment against a disability discrimination claim where the employee "ha[d] not shown that there were vacant positions at [the employer] for which he was qualified"). Thus, even though Andersen did not

ultimately rehire McLain at a different position, nothing in the record supports McLain's assertion that Andersen failed to hire him or terminated him because it regarded him as disabled. For these reasons, we hold the that district court correctly granted summary judgment against McLain's disability-discrimination claim.

2. Discriminatory Reprisal

McLain also claims that Andersen violated the MHRA by engaging in discriminatory reprisal against him and that the district court erred in granting summary judgment against this claim. See Minn. Stat. § 363A.15 (prohibiting discriminatory reprisal). McLain specifically argues that Andersen sent him home in August 2006, refused to train him for other jobs, and terminated him in April 2007 because he asked for an accommodation, complained about discriminatory conduct, and filed this suit.

The parties agree that we must analyze McLain's claim under McDonnell Douglas. See Hoover, 632 N.W.2d at 548 (applying McDonnell Douglas to an MHRA reprisal claim). Accordingly, McLain must demonstrate as a prima facie case that: (1) he engaged in "statutorily-protected conduct;" (2) Andersen subjected him to an "adverse employment action;" and (3) there was "a causal connection between the two." Id. (quotation omitted). If McLain makes that showing, "the burden shifts to [Andersen] to articulate a legitimate and non-discriminatory reason for the adverse employment action. The burden then shifts back to [McLain] to show that the proffered reasons were . . . pretext for discrimination." Potter v. Ernst & Young, LLP, 622 N.W.2d 141, 145 (Minn. Ct. App. 2001) (citing McDonnell Douglas, 411 U.S. at 802, 804).

Assuming without deciding that McLain satisfies the prima facie case for his claim, Andersen articulates legitimate, non-pretextual reasons for its actions. First, according to the record, Andersen sent McLain home in August 2006 because of Dr.

-19-

Haley's conclusions regarding McLain's work restrictions. Specifically, it is undisputed that Dr. Haley submitted a report to Andersen in August 2006 stating that McLain was permanently disabled from any occupation. It is also undisputed that Dr. Haley had twice before restricted McLain from work, and McLain concedes that Andersen had consistently honored Dr. Haley's instructions. Thus, the record supports Andersen's argument that it had legitimate reasons for sending McLain home in August 2006, and nothing in the record demonstrates that these reasons were pretextual.

Second, the record also demonstrates that Andersen did not train McLain to perform an alternative job because no other jobs were available. It is undisputed that the housing market slowed while McLain was on leave and that, as a result, Andersen was laying off hundreds of employees throughout its operations. Consistent with this fact, Andersen did not fill the one position that McLain claims became open while he was on leave. Instead, Andersen assigned the position's responsibilities to another employee who took responsibility for the duties—which only amounted to a few hours per week—in addition to his regular job. Moreover, regardless of that fact, Andersen advised McLain that he could apply for tuition reimbursement if he took an appropriate class to train as a Class A driver, indicating that Andersen did not discourage McLain from obtaining training. Thus, we reject McLain's claims that Andersen retaliated against him by refusing to train him for another position.

Finally, for reasons described above, the record supports Andersen's contention that it terminated McLain in April 2007 because it had no work for him, and McLain admittedly presents no evidence of vacant positions that Andersen filled for which he was qualified. See McPherson, 491 F.3d at 731 (affirming an adverse grant of summary judgment against a disability-discrimination claim where the employee "ha[d] not shown that there were vacant positions at [the employer] for which he was qualified). Thus, even assuming that McLain satisfies the prima facie case for his reprisal claims, the district court correctly dismissed these claims on summary

-20-

judgment because Andersen presented legitimate reasons for its actions and, even viewing the evidence in McLain's favor, the record shows that those reasons were not pretextual.

### 3. Misrepresentation

McLain's final argument on appeal is that the district court erred in granting summary judgment against his misrepresentation claim because the record shows Andersen misrepresented that it would actively search to find him work as well as misrepresented its training policies to prevent him from upgrading his license. To prove a misrepresentation claim under Minnesota law, a plaintiff must prove:

> (1) the defendant made a representation; (2) the representation was false; (3) the representation related to a past or present fact; (4) the fact was material; (5) the fact was susceptible of knowledge; (6) the defendant either knew the fact was false or asserted it as knowledge without knowing whether it was true or false; (7) the defendant intended the representation to induce the plaintiff to act or be justified in acting upon it; (8) the representation justifiably induced the plaintiff to act on it; (9) the plaintiff acted in reliance upon the representation; (10) the plaintiff suffered damage; and (11) the false statement proximately caused the plaintiff's injury.

Burmeister v. Westerhouse, No. A08-0320, 2009 WL 234072, at *3 (Minn. Ct. App. Feb. 3, 2009) (unpublished) (citing Davis v. Re-Trac Mfg. Corp., 149 N.W.2d 37, 38–39 (1967)). McLain fails to satisfy these requirements.

Regarding McLain's claim that Andersen misrepresented that it was searching for work for him, the record supports Andersen's assertions that it did search for work for McLain. Andersen has presented affidavits of employees who claim they did search for work for McLain but that no jobs were available, and there is record evidence that Andersen investigated work opportunities for

-21-

McLain before terminating his employment. Additionally, as described above, the undisputed facts also show that Olson called McLain to discuss finding him work, notified him of a potential Class A driving position, and discussed Andersen's Class A training policies with him. Moreover, Hauble identified jobs that she believed McLain could perform and solicited information from McLain to aid her in her search. This evidence indicates that Andersen was in fact searching for work for McLain, and, beyond citing one potential job opening that Andersen did not fill with a new employee, McLain presents no evidence to support his claim or to discredit Andersen's evidence. See Williams v. Tweed, 520 N.W.2d 515, 517 (Minn. Ct. App. 1994) ("Thus, because Williams failed to support his claim with any evidence of a misrepresentation, there is no genuine issue of material fact.").

Regarding McLain's claim that Andersen misrepresented its training programs, McLain did not allege this misrepresentation in his complaint, which is inconsistent with Minnesota's rules that such claims must be pled with particularity. See Michel v. Vogelpohl, A05-1263, 2006 WL 1073191, at *5 (Minn. Ct. App. Apr. 25, 2006) (unpublished) (dismissing both fraudulent and negligent misrepresentation claims where a plaintiff's complaint failed to "specify with particularity which statements were false and fraudulent at the time they were made" (citing Minn. R. Civ. P. 9.02)). Thus, his claim fails as a matter of law.

Finally, in addition to the foregoing reasons, McLain openly admitted at his deposition that no one at Andersen said anything to him that was false and that no one at Andersen lied to him during the time period in question. Instead, McLain stated that his only basis for his misrepresentation claim was that people "quit representing [him]" and failed to follow through with information he requested. Those allegations simply do not support his claims that people at Andersen made false or incomplete representations to him. For those

-22-

reasons, the district court appropriately granted summary judgment against McLain's misrepresentation claim.

## III.

For the foregoing reasons, we affirm the judgment of the district court.

_____